No. 85,172

STATE OF KANSAS, *Appellee*, v. LEONARD B. KIRBY, JR., *Appellant.*

(39 P.3d 1)

Opinion filed January 25, 2002.

*Peter Maharry*, assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with him on the briefs for appellant.

*Sheryl L. Lidtke*, assistant district attorney, argued the cause, and *Nick A. To-masic*, district attorney, and *Carla J. Stovall*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is an appeal by the defendant, Leonard B. Kirby, Jr., from his conviction of the unintentional second-degree murder of Karen Couts, who died as a result of a ruptured spleen after twice seeking emergency medical care at the University of Kansas Medical Center (UKMC). Kirby contends that causation instructions should have been given with regard to the alleged negligence of UKMC emergency room physicians, which he claims was an efficient intervening cause of death. Kirby requests that his conviction be reversed and the case remanded for a new trial. In the alternative, Kirby asks the court to vacate his sentence, which is a controlling term of 146 months with post-release supervision of 36 months.

Karen worked in construction operating heavy equipment, was 38 years old, and had three children, Janee, age 20, Jessica, age 19, and Michael, age 10, at the time of her death in December 1998. Karen lived with Kirby.

Janee testified that the weekend before Thanksgiving she had to pick up her mother because Kirby and Karen had gotten into a fight and the police were there. Karen had scratch marks on her neck and told Janee that Kirby was "dragging her by her larynx, that he had been pulling her like he was going to pull it out, not that he said he was, but he was like choking her, grabbing her by her larynx." Karen spent the night at Janee's apartment in Overland Park.

The next morning as Janee and her roommate were getting ready to leave, Kirby came to the door. When Janee returned about an hour later, there were police cars parked in front of her apartment. That day, Janee's neighbor, Barbara Machin, heard a disturbance outside and saw Karen lying on the ground while Kirby hit her in the face with his fists. Machin called 911. Another neighbor, Michael Weddington, also called police after he saw Kirby repeatedly hit Karen in the face and chest. Weddington testified that Kirby

then walked to his truck, where several of his children were waiting, and drove up on the lawn toward where Karen was lying. Karen told Janee that Kirby had attacked her and had tried to run over her with his truck. Initially, Karen wanted to press charges, but later she resumed her relationship with Kirby. Less than 1 month later, Kirby again attacked Karen. This attack led to Karen's death.

On Friday, December 18, 1998, Kirby and Karen went out to several bars. Eliza DeGhelder testified that she threw a surprise birthday party for the owner of Miss Kitty's bar that night and invited Kirby and Karen to attend. DeGhelder saw them at Miss Kitty's sometime between 6 and 8 p.m. and spoke with Karen for about 10 to 15 minutes.

Jamie Bishop testified that he was tending bar at Cedar Lawn and saw Karen there around 11 p.m. Karen spoke with Wayne Willeford, the brother of her ex-husband, and asked him to whip Kirby if he came to the bar. Approximately 30 minutes later, Kirby entered Cedar Lawn and walked up to the bar. Karen confronted Kirby, screaming at him, and then ran into the bathroom. After she came out, she began shoving Kirby and screaming at him. As far as Bishop could tell, Karen wanted Kirby to leave her alone. Karen went out the front door, and 2 or 3 minutes later Kirby followed. Bishop said that when he came back into the bar, Kirby had a scratch on his forehead. Kirby said Karen had gotten into a car with two other men and that one of the men had hit him. Kirby stayed at the bar another 10 or 15 minutes and then left around midnight. Bishop said that before Kirby left, he took a phone call from Karen, and then talked to Willeford and his girlfriend about going to Miss Kitty's bar to find Karen.

Mark Powers testified that Karen came to his house in Kansas City, Kansas. Powers lived there with his wife and four of his six children. Powers said that he and Karen were friends. Karen had lived across the street from Powers with David Cheaney, her youngest son's father, for several years, but had not been living with Cheaney the past 2 years. Powers drove Karen to her home and arrived at approximately 1:10 a.m.

Keith Ussery testified that on the night of December 18, 1998, he lived with Lori Packer and her son on South 14th Street. Ussery

said that around 1 a.m., Packer woke him up. Packer said, "They're fighting again next door," and "Keith, they're really fighting this time." From the bedroom window, Ussery could see Karen and Kirby fighting on a concrete walkway behind their house. The motion-detector security light was on and Ussery could see "real well what was going on."

Ussery saw Karen lying on the ground and Kirby kicking her with his boots and hitting her with his fists. According to Ussery, Kirby kicked her more than a dozen times in the "stomach, the head, just wherever he could kick, whatever he could hit." When asked where on the stomach Kirby kicked Karen, Ussery responded: "The sides, the front, the back because he'd kick her and she'd like roll away and he'd kick her again and stomp on her." Ussery witnessed Kirby striking Karen's head, stomach, back, and sides repeatedly with his fists, and said at one point, Kirby literally picked Karen up and threw her inside the house. At one point, Kirby was on top of Karen shaking her and hitting her head on the concrete. Ussery stated that "a couple times she would try to hit him back, but most of the time she was pleading with the man to stop . . . ." Ussery told Packer to call the police but to stay out of it. Right before the police came for the second time, Karen fled north down 14th Street, first crossing through Packer's back yard. Ussery saw Kirby jump the fence behind the houses and flee into the woods.

Packer also witnessed Kirby attacking Karen. Just as she was preparing to go to bed around 1 a.m., she heard a truck squeal into the driveway next door, followed by a male voice screaming. Packer testified she knew it was Kirby's voice because she had heard him scream at Karen before. When Packer looked out of her bedroom window, she saw Karen lying on the ground and Kirby straddled on top of her waist. Packer testified, "He was hitting her with his fist full force, the back of his—with his knuckles as hard as he could on the side of her head." Kirby kept asking her where she was, and after a while told her he would kill her if she did not tell him where she went and with whom. Packer also saw Kirby grab Karen by the head and slam it on the ground using full force. In addition, Packer said Kirby forcefully kicked Karen's left side three or four times

with his boots. According to Packer, Karen kept telling him to stop and that she loved him. She tried to get her hands free and then would try to hug Kirby.

Packer called 911 five times that night, pleading with the dispatcher to send police. According to 911 records, Packer's first call was at 1:14 a.m., and the fifth call at 1:44 a.m. The first time police arrived at the residence, they knocked on the front door and then left after no one responded. Packer told the dispatcher that Karen and Kirby were in the back yard, but Packer did not want to open her door and talk to the police because she did not want Kirby to know she called the police. After the police left, Packer saw Kirby still on top of Karen beating her in the head. Karen screamed and asked for help, so Packer called the police again. After telephoning 911 again, Packer went back to her window to check on Karen. Karen had jumped over the fence into Packer's back yard, had gone through the gate, and up the street. Packer went to the front of her house to see where Karen was going and saw the police coming. Kirby jumped the back yard fence and went into the woods to hide. Packer told an officer where Kirby was, but the officer could not see Kirby in the woods. When one of the officers announced Karen had been found up the street, the other officers left to make sure it was her. Packer said that when the police left, Kirby came back over the fence to the house, banged on the windows, and screamed, "Let me in." The officers returned, and Kirby again went over the fence into the woods. This time, however, they found Kirby and placed him under arrest.

Paramedics transported Karen to the UKMC emergency room. Todd Farley, an emergency medical technician, testified that initially Karen refused to let anyone examine her, but after she calmed down and warmed up in the back of the ambulance, she consented to an exam. Farley stated: "[S]he was very swollen in the head, the forehead, around the eyes, she had lots of dry blood that was around her nose and her mouth. . . . [S]he was complaining of pain around her wrist and you could tell on her left wrist was swollen and somewhat deformed. . . . She complained of pain to her ribs . . . ." In addition, she was "guarding" against the pain every time the paramedics would push on her left side.

Dr. Vincent Hayes, an emergency medicine physician, treated Karen at the UKMC emergency room early Saturday morning, December 19, 1998. Karen complained of generalized pain, pain to her face, abdomen, lower chest, and left wrist. Since Karen gave a history of being kicked in the abdomen and complained of tenderness in the area of her spleen, Hayes ordered a CAT scan and x-ray studies. Hayes testified that the CAT scan showed nothing indicating an injury to the spleen. On cross-examination, Hayes agreed that clinical symptoms of hypovolemia, tachycardia, general upper abdominal pain, and pain at the tip of the shoulder could indicate splenic injury. However, Hayes stated that Karen only exhibited signs of generalized abdominal pain and slight tachycardia, which improved during the time Karen was there. Hayes stated that when he discharged her at 5:30 a.m. Saturday, she was alert, stable, and left on her own power.

On Friday night, Karen's daughter Janee had gone to a birthday party and returned home around 2 or 2:30 a.m. About 3 a.m., Janee received a call from a nurse at UKMC telling her to come get Karen because she was badly hurt.

Janee testified that when she first saw Karen, "[h]er face was really badly beaten, she had like dried blood lumps on her face, her hair was matted, it had like grass in it. . . . [H]er face was just—it looked like she was a burn victim her face was so red and disfigured, it looked terrible. . . . As soon as she saw me she started to cry." Janee testified that she heard Karen tell the doctor, "My ribs are sore. Are they broken?" The doctor told Karen, "No, the CAT scan or your tests—the x-rays came back, you have no broken ribs. It will be sore for a while." After Karen was discharged, she was able to walk to the car with Janee.

Janee picked up Karen's prescription for Tylenol 3 around 5:30 p.m. on Saturday, December 19, 1998. That evening, Karen's condition progressively deteriorated and, according to Janee, Karen was experiencing sharp pains in her left shoulder area. On Sunday morning, Karen complained of shooting pain from her abdomen to her left shoulder and told Janee she wanted to go back to the hospital.

Dr. Richard Dietz, an attending physician, and Dr. Iliana Jarrin, a resident physician, examined and treated Karen at UKMC emergency room on Sunday, December 20, 1998. According to Dietz, Karen's symptoms were similar to those in her medical records from Saturday. Dietz testified that they performed a complete physical exam on Karen, trying to determine the source of her pain. They palpated the area of her liver and spleen, but determined neither were enlarged and did not notice any guarding or rebounding. They did note that Karen's "blood pressure was a little lower and her pulse rate was higher." Because a CAT scan had already been done and because they found no focal tenderness over the liver, Dietz testified that they decided against further x-rays or CAT scans at that time.

Janee testified that while they waited in the exam room for the doctor, Karen became nauseous and vomited. According to Janee, Karen was given a shot to relieve the nausea. After they left UKMC around 12:30 p.m., Janee had to help Karen walk into the apartment. At 5:30 p.m., Karen tried to walk to the bedroom but collapsed, falling down on her knees. Janee laid her down on the floor and got her a blanket and pillow. At 9 p.m., Karen crawled from the living room into the bedroom.

Around 12:30 or 1 a.m. on Monday morning, Karen woke Janee saying she was going to get sick and vomited on the bed. About 3:15 a.m., Karen began crawling from the bed saying she had to get to the bathroom. She was so weak that Janee had to lift her onto the toilet. As Janee went to get clean clothes, her mother had a spasm, screamed, went stiff, and then lunged back. Janee yelled for her roommate to call 911. Officer Gregory Powell, who responded to the call around 3:45 a.m., entered the bathroom and helped carry Karen, who had become limp and unresponsive, to the living room where he and Janee started CPR. Med-Act paramedics and fire department personnel arrived and began CPR on Karen, but she never regained consciousness. After about 40 minutes, a doctor instructed them to cease CPR.

Dr. Erik Mitchell, a forensic pathologist, performed a postmortem examination on Karen's body. Mitchell's external examination revealed "a large number of bruises associated with some—with

abrasion, which is scraping of the skin, she even had some gouges of skin where some skin had been gouged out." He noted a bruise on her forehead with patterned lines, demonstrating a heavy contact blow he thought came from the sole of work boots. Both eyes were black and there were scrapes on her nose, a line of bruising that went up from the right ear, and gouges to the chin that would be consistent with having been hit or kicked. About 30 bruises were present on her body. The backs of her hands and wrists were red and swollen, there was a solid bruise from her forearm to the knuckles of her right arm, as well as several more bruises and abrasions. Mitchell found imprint bruises over the left side of her chest, on her knees, and on the back of her thighs. In addition, Mitchell noted that the abdomen appeared swollen, suggesting something inside causing the protuberance.

As part of the internal exam, Mitchell made an incision into her scalp to look for areas of injury. There were nine separate areas of bruising to the scalp from multiple impact injuries that had started to run together. Mitchell also found nondisplaced fractures of ribs 6, 7, 8, and 9 on Karen's left side. Mitchell testified: "The most dramatic internal finding, which was that the splenic rupture—the spleen had formed—it had been damaged and a blood clot had formed in the spleen. In fact, the clot that I removed from the spleen was 970 grams, and the average spleen is probably between 125 and 200 grams or so. . . . And what had happened was there was bleeding inside the spleen . . . . [I]t had eventually reached the limit of its ability to stretch and it popped."

Mitchell testified that "it's blunt trauma that kills her. The mechanism that finally is involved is the damage to the spleen and the bleeding from the spleen." Mitchell testified that the blow that damaged Karen's spleen would have occurred within a few days of her death and related her death directly to that trauma.

Kirby presented the expert testimony of Dr. John Hiebert, a board certified plastic surgeon additionally trained in general surgery, trauma surgery, and nutrition. Hiebert was retained by Kirby to review Karen's medical records and render an opinion on the treatment she received at UKMC. Hiebert noted that according to the medical records, the bruises over the fractured rib area on

Karen were not present on the first examination on Saturday, December 19. Thus, Hiebert posited that Karen might have suffered a new injury. Furthermore, in Hiebert's opinion, based on Karen's medical records, there was sufficient information for a physician to conclude on December 20 that she had an injury to her spleen, warranting another chest x-ray. Hiebert testified:

> "If it had been pursued and there was evidence of her fractures and/or striation or leakage in that spleen, then there's no question that she didn't need to die. The spleen could have been removed and that would have been it. Many people have far greater injuries than she had survive. She didn't because her spleen ruptured."

After a 6-day trial, a jury convicted Kirby of unintentional second-degree murder on November 17, 1999. On January 28, 2000, Kirby was sentenced to a controlling sentence of 146 months, with post-release supervision for 36 months. Kirby filed this appeal pursuant to K.S.A. 22-3601(a) on January 31, 2000. The matter is before this court pursuant to a K.S.A. 20-3018(c) transfer.

## I. JURY INSTRUCTIONS

The first assertion of error made by Kirby is that the trial court improperly instructed the jury on causation and the effect of an efficient intervening cause. Kirby asserts that Karen died from a ruptured spleen 2 days after he assaulted her because of a lack of proper treatment by medical personnel at UKMC.

> "When reviewing challenges to jury instructions, we are required to consider all the instructions together, read as a whole, and not to isolate any one instruction. If the instructions properly and fairly state the law as applied to the facts of the case, and a jury could not reasonably have been misled by them, the instructions do not constitute reversible error even if they are in some way erroneous. [Citation omitted.]" *State v. Mitchell*, 269 Kan. 349, 355, 7 P.3d 1135 (2000).

Here, the trial court gave several instructions to the jury on the proximate cause of death and medical negligence:

> "INSTRUCTION NO. 16
>
> "To constitute an unlawful homicide, (First Degree Murder—Premeditated, Second Degree Murder—Intentional, Second Degree Murder—Unintentional, Voluntary Manslaughter or Involuntary Manslaughter) there must be, in addition

to the death of a human being, an unlawful act which was a proximate cause of that death.

"The proximate cause of a death is a cause which, in natural and continuous sequence, produces the death, and without which the death would not have occurred.

"There may be more than one proximate cause of a death. When the conduct of two or more person contributes concurrently as proximate causes of a death, the conduct of each of said persons is a proximate cause of the death regardless of the extent to which each contributes to the death. A cause is concurrent if it was operative at the moment of death and acted with another cause to produce the death."

### "INSTRUCTION NO. 17

"Where the original injury is a proximate cause of the death, the fact that the immediate cause of death was the medical or surgical treatment administered or that such treatment was a factor contributing to the cause of death will not relieve the person who inflicted the original injury from responsibility."

### "INSTRUCTION NO. 18

"The fact, if it be a fact, that some other person was guilty of negligence which was a contributory cause of the death involved in the case, is no defense to a criminal charge."

### "INSTRUCTION NO. 19

"One of the theories of the defense is that negligent treatment by physicians at the University of Kansas Medical Center was the sole proximate cause of death of Karen Couts and not the beating she sustained. You are instructed that if you find the defendant did cause the injuries inflicted on the person of Karen Couts, then you must determine whether the acts of the defendant contributed to the death of Karen Couts. If you find defendant's acts contributed to the death . . . then responsibility cannot be avoided . . . [for] any unlawful homicide charge (First Degree Murder—Premeditated, Second Degree Murder—Intentional, Second Degree Murder—Unintentional, Voluntary Manslaughter, or Involuntary Manslaughter)."

Kirby states that the general rule regarding criminal liability is found in *State v. Shaffer*, 223 Kan. 244, 574 P.2d 205 (1977). In *Shaffer*, the victim was shot in the head by the defendant but still had a pulse and was breathing when the ambulance arrived. A neurosurgeon determined the victim had suffered irretrievable brain damage, and could be pronounced dead at any time, even though the victim could be maintained by artificial means indefinitely. Family members decided not to prolong his life by a respirator and allowed his kidneys to be removed for transplantation.

The defendant argued that the kidney transplant was the cause of death. This court stated: "Where a person inflicts upon another a wound which is calculated to endanger or destroy life, it is not a defense to a charge of homicide that the alleged victim's death was contributed to . . . by the negligence of the attending physicians or surgeons. [Citation omitted.]" 223 Kan. at 250.

Kirby contends that within that general rule is the prerequisite that the jury find that the defendant inflicted upon another a wound calculated to endanger or destroy life. Under Kirby's reasoning, because the jury found him guilty of *unintentional* second-degree murder, the injuries he inflicted were not calculated to kill and, thus, the jurors should have had the opportunity to decide if the negligence of physicians would operate to relieve him from liability for Karen's death.

The fundamental flaw in Kirby's proposition is that a conviction of unintentional second-degree murder does not negate the purposeful infliction of wounds "calculated to endanger or destroy life." Kirby would have us believe that because his intentional infliction of severe wounds resulted in a death he did not intend, his infliction of those injuries could not be calculated to kill. We find that the words "wounds calculated to endanger or destroy life" reflect an objective measure of severity of the wounds and have nothing to do with an attacker's subjective intent in inflicting the wounds.

Both Packer and Ussery saw Karen lying on the ground while Kirby was kicking her with his boots and punching her with his fists. According to witnesses, Kirby struck and kicked Karen's head, stomach, back, and sides repeatedly. Kirby also sat on top of Karen, shaking her and hitting her head on the concrete. Dr. Mitchell testified about a bruise on Karen's forehead, which corresponded with the pattern of the sole of Kirby's work boots, and about areas of her face where the skin had been gouged out. Here, there is ample evidence that Kirby inflicted wounds on Karen which were calculated to endanger or destroy life.

Kirby further contends that the instructions given in this case, while applicable to cases of ordinary negligence, would not apply to situations where there is gross negligence or an efficient inter-

vening cause. Therefore, Kirby believes the trial court erred in not allowing the jury to determine whether the negligence of medical personnel rose to the level of an efficient intervening cause, breaking the connection between his actions and Karen's death. Kirby asserts that the question of whether the actions of the medical personnel amounted to a defense to the charge of murder was a question for the jury and that "the jury should have been instructed on the theory of an efficient intervening cause."

The State asserts that Kirby requested instructions that were inconsistent with the law and that the jury was properly instructed on the issue of causation, citing *State v. Lamae*, 268 Kan. 544, 998 P.2d 106 (2000). There, the girlfriend of the defendant was killed in a house fire that evidence suggested began as a result of the production of methamphetamine. The defendant argued that the trial court's refusal to instruct the jury that, in a felony murder, the death must be a direct result of the commission of a felony prevented him from arguing the intervening cause of the girlfriend's own negligence in her death. This court found no error in failing to give the requested instruction. We stated: "[T]he general rules of proximate cause used in civil actions do not apply. Rather, a defendant will be found not responsible for the death which occurs during the commission of a felony only if an extraordinary intervening event supersedes the defendant's act *and becomes the sole legal cause of death*." (Emphasis added.) 268 Kan. 555.

Finally, in support of the idea that Kirby's requested instructions were inconsistent with the law, the State cites *State v. Anderson*, 270 Kan. 68, 12 P.3d 883 (2000). There, we reversed the district judge's dismissal of the charge of involuntary manslaughter where an officer pursuing a speeding motorcyclist ran a stop sign resulting in the death of another motorist. We noted:

"In the context of negligence, the Restatement (Second) of Torts defines a 'superseding cause' as 'an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about.' Restatement (Second) of Torts § 440, p. 465 (1965). If the likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious, or

criminal does not prevent the actor from being liable for harm caused thereby. Restatement (Second) of Torts § 449, p. 482." 270 Kan. at 74.

In our analysis of the facts presented in *Anderson,* we stated:

"Here, the issue of Anderson's criminal responsibility focuses upon Anderson's point of view, that is, whether the harm that occurred was a reasonably foreseeable consequence of Anderson's conduct at the time he acted. Since the trooper's conduct was a direct and specific response to defendant's conduct, the claim that the trooper's conduct was a superseding cause of the accident can be supported only by a showing that the trooper's conduct was so unusual, abnormal, or extraordinary that it could not have been foreseen.

"Our test for foreseeability set out in [*State v.*] *Davidson* [,267 Kan. 667, 987 P.2d 335 (1980)] is the same as that articulated by the *Schmies* court [*People v. Schmies,* 44 Cal. App. 4th 38, 51 Cal. Rptr. 2d 185 (1996)] in that it focuses on the defendant's point of view, that is, whether the harm that occurred was a reasonably foreseeable consequence of the defendant's conduct at the time he or she acted or failed to act. [Citation omitted.]" 270 Kan. at 76-77.

Here, Hiebert testified that had the bruising to Karen's ribs been pursued by the treating physicians at UKMC and another chest x-ray taken, then Karen might not have died. Mitchell, on the other hand, concluded that blunt trauma resulting in damage to the spleen had killed Karen. It is clear that the physicians' actions were not so unusual, abnormal, or extraordinary that they could not have been foreseen. The physicians' negligence, if any, did not supersede the effect of the wounds inflicted by Kirby so as to become the sole legal cause of Karen's death.

The trial court's Instruction No. 19 to the jury stated that if "defendant's acts contributed to the death of Karen Couts then responsibility cannot be avoided by the fact that independent causes such as the negligence of others also contributed to the death." It also stated that if "the proximate cause of death resulted solely from erroneous treatment of the physicians you must acquit defendant . . . of any unlawful homicide charge . . . ." Contrary to Kirby's assertions, we find that the jury was allowed to consider whether the actions of the medical personnel amounted to a defense to a charge of murder.

Considering the instructions given to the jury as a whole, we find that they properly and fairly stated the law as applied to the facts of the case, and the jury could not reasonably have been misled by

them. Thus, we hold that in instructing the jury, the trial court did not commit reversible error.

## II. PRIOR ALTERCATION WITH SAME VICTIM

The second assertion of error is that the trial court erred by allowing the State to present evidence of the November 21, 1998, altercation between Kirby and Karen. Kirby contends that the altercation at Janee's house was completely separate from the events of December 19, had no relevance to the issues involved in the trial, was highly prejudicial, and should have been excluded.

"The admissibility of evidence lies within the sound discretion of the trial court. In *State v. Sims*, 265 Kan. 166, 175, 960 P.2d 1271 (1998), the court stated that ' "it is clear that our standard of review regarding a trial court's admission of evidence, subject to exclusionary rules, is abuse of discretion." ' [Citation omitted.]" *State v. Lumley*, 266 Kan. 939, 950, 976 P.2d 486 (1999).

"When a question arises as to whether evidence at trial is unfairly prejudicial, the trial court has an obligation to weigh the probative value of the evidence. When the prejudicial effect of the evidence on the trier of fact outweighs the probative value of the evidence, the evidence should be excluded." 266 Kan. 939, Syl. ¶ 5.

On the second day of trial, November 9, 1999, the trial court ruled that, based on *State v. Green*, 232 Kan. 116, 652 P.2d 697 (1982), it would permit evidence of Kirby's prior conduct to come in independent of K.S.A. 60-455. Judge Thomas L. Boeding stated:

"[E]vidence of the discordant marital relationship and previous ill treatment is relevant bearing on the defendant's motive and intent, and I think that that's well recognized in Kansas law.

"There's a number of cases that I read, some which were cited by counsel in their briefs, but I suppose the main case is *State v. Green*, 232 Kan. 116. So that evidence will be permitted in this particular case."

This court has previously stated:

"We have addressed the issue of relevance of evidence of a discordant relationship between a defendant and a victim in numerous cases and have held that admission of evidence of a discordant relationship is admissible independent of K.S.A. 60-455 and relevant to show the ongoing relationship between the parties, the existence of a continuing course of conduct, or to corroborate the testimony of witnesses as to the act charged. See *State v. Hedger*, 248 Kan. 815, 820, 811

P.2d 1170 (1991); *State v. Taylor*, 234 Kan. at 407; *State v. Green*, 232 Kan. 116, Syl. ¶ 4, 652 P.2d 697 (1982). In *Hedger*, we also discussed the remoteness of such evidence and held that any lapse of time between the acts described in the trial testimony and the acts alleged does not preclude the admission of evidence relative to motive and intent, but only goes to the weight to be given the evidence. 248 Kan. at 820 (citing *State v. Green*, 232 Kan. 116, Syl. ¶ 5)." *State v. Clark*, 261 Kan. 460, 470, 931 P.2d 664 (1997).

The State had formally charged Kirby with one count of first-degree murder on March 4, 1999. At trial, Kirby testified that although he admitted having an altercation with Karen on December 19, he denied having any intent to kill her. Thus, Kirby's intent was at issue. The evidence relating to Kirby's past attacks on Karen was probative as to his motive and intent, the ongoing relationship between the parties, and the existence of a continuing course of conduct between the parties. Despite Kirby's claims that such evidence would inflame the jury, the jury found Kirby guilty of unintentional second-degree murder. Because the probative value of the evidence in regard to motive and intent outweighed any prejudice to Kirby, the trial court did not err in admitting the evidence.

### III. MULTIPLE AUTOPSY PHOTOGRAPHS

The third assertion of error is that the trial court erred in admitting 18 autopsy photographs and 6 other photographs depicting Karen's injuries. Kirby argues that the photographs were "highly prejudicial," had "little probative value as the actual cause of death was not in dispute," and "did not aid the jury on the issues in dispute."

" 'Admission of demonstrative photographs lies within the broad discretion of the trial judge. In determining whether demonstrative photographs should be admitted, a trial judge must determine whether they are relevant and whether a proper foundation has been laid.' [Citation omitted.]" *State v. Roberts*, 261 Kan. 320, 329, 931 P.2d 683 (1997)

At trial, 18 autopsy photographs were admitted in conjunction with the testimony given by Mitchell. In addition, the court actually admitted seven other photographs of Karen that were taken while she was alive; four were taken by the police after the November

21 altercation, and three were taken by Karen's daughter following the December 19 beating. After looking at the photographs in question, the trial court observed that none of them were outrageous or were "the kind that would inflame anybody."

The three photographs of Karen, labeled Exhibits 22, 25, and 26, were pictures taken by Karen's daughter Jessica on Sunday evening, December 20, 1998. The State sought their admission during the testimony of Janee. Counsel for the State noted that these photographs were the only pictures taken after the beating while Karen was still alive, and asserted that they served as proof of Karen's condition just a few hours before her death. Counsel for Kirby objected, asserting that the photographs lacked relevance and were more prejudicial than probative. The trial court ruled that the three photographs would be received into evidence.

The four other photographs of Karen, contained in Exhibit 87, were taken by Officer Amy Auld in conjunction with the altercation between Kirby and Karen on November 21, 1998. The photographs were admitted by the trial court over the objection of Kirby's counsel, who objected to their admission on the grounds of relevancy.

"The law is well settled in this state that, in a crime of violence which results in death, photographs which serve to illustrate the nature and extent of the wounds inflicted are admissible when they corroborate the testimony of witnesses or are relevant to the testimony of a pathologist as to the cause of death, even though they may appear gruesome. [Citation omitted.]

" . . . Photographs which are unduly repetitious, gruesome, and without probative value should not be admitted into evidence. [Citation omitted.] Nevertheless, demonstrative photographs are not inadmissible merely because they are gruesome and shocking where they are true reproductions of relevant physical facts and material conditions at issue. [Citation omitted.]" *State v. Stone*, 253 Kan. 105, 110-11, 853 P.2d 662 (1993).

The photographs were relevant to show the nature and extent of the injuries Karen sustained as a result of the two beatings administered by Kirby. Furthermore, the autopsy photographs are relevant in corroborating the testimony of Mitchell. All of the autopsy photographs admitted into evidence were taken prior to any incisions made by Mitchell and were not of a nature to inflame the jurors.

Here, the photographs of Karen were relevant to show the violent nature of Kirby's attacks on Karen, the nature and extent of her injuries, the elements of the crime charged, the fact and manner of Karen's death, and to corroborate the testimony of the witnesses. "[E]vidence offered to prove the elements of the crime, the fact and manner of death, and the violent nature of the death and to corroborate the testimony of other witnesses is relevant and admissible. [Citation omitted.]" *State v. Steadman*, 253 Kan. 297, 306, 855 P.2d 919 (1993). Kirby's assertion of error fails.

## IV. PROSECUTORIAL CONDUCT

Kirby's fourth assertion of error is that the State committed prosecutorial misconduct during closing arguments by appealing to the jury's emotions and seeking a conviction based solely on sympathy for the victim. At trial, counsel for Kirby did not object to the comments of the prosecutor he now points to as erroneous.

This court discussed the standard of review to be applied where allegations of prosecutorial misconduct are raised for the first time on appeal in *State v. McCorkendale*, 267 Kan. 263, 979 P.2d 1239 (1999):

"Kansas does not ordinarily apply the plain error rule, and reversible error normally cannot be predicated upon a complaint of misconduct by the prosecutor during closing argument where no contemporaneous objection is lodged. If the prosecutor's statements, however, rise to the level of violating a defendant's right to a fair trial and deny a defendant his or her Fourteenth Amendment right to due process, reversible error occurs despite the lack of a contemporaneous objection. Where the appellate court, in examining a claimed error of prosecutorial misconduct, determines that the misconduct may rise to the level of violating a defendant's right to a fair trial, the claimed error will be considered. Thus, the plain error rule is recognized where the prosecutor's misconduct is so prejudicial or constitutes a constitutional violation that if not corrected will result in injustice or a miscarriage of justice." 267 Kan. 263, Syl. ¶ 5.

"The analysis of the effect of a prosecutor's allegedly improper remarks in closing argument is a two-step process. First, the appellate court must determine whether the remarks were outside the considerable latitude the prosecutor is allowed in discussing the evidence. This analysis commences with the holding that in criminal trials, the prosecution is given wide latitude in language and in manner or presentation of closing argument as long as it is consistent with the evidence adduced. Second, the appellate court must determine whether the remarks constitute plain error; that is, whether they are so gross and flagrant as

to prejudice the jury against the accused and deny him or her a fair trial, requiring reversal." 267 Kan. 263, Syl. ¶ 7.

Kirby complains that the following statement of the prosecutor improperly asked the jury to convict out of a sense of sympathy for the victim:

"He [Kirby] wants to make this a case of blaming other people. Well, who is to blame in all of this? I suppose you could say that at least two other systems have failed this woman. The police were called four or five times that night. They should have responded more quickly, they should have gotten back and investigated more thoroughly, they should have found the two of them back there and stopped it then. That was the first system that failed her.

"The second one is probably the doctors. Dr. Dietz probably should have discovered that her spleen was bleeding by the time he saw her. So the medical system has failed her, too.

"Don't let the criminal justice system fail her, too. Don't be the third system that fails the woman. Her death was caused by this man and you have to find him guilty of first degree murder."

Kirby argues that the prosecutor was not asking the jurors to weigh the evidence, but rather was asking them to convict him because Karen suffered. According to Kirby, the prosecutor made an impermissible appeal to the passions and emotions of the jurors.

We find that the prosecutor's remarks did not show ill will and were not so gross and flagrant as to deny Kirby a fair trial. See *State v. Leitner*, 272 Kan. 398, Syl. ¶ 12, 34 P.3d 42 (2001). Thus, in the absence of an objection, we will not consider this issue.

## V. GUILTY BEYOND A REASONABLE DOUBT

For his fifth assertion of error, Kirby argues that there was insufficient evidence to allow a jury to find him guilty beyond a reasonable doubt of second-degree murder. Kirby breaks his argument into two parts. First, he contends there was insufficient evidence for a jury to conclude that the injury which caused Karen's death was inflicted by Kirby. Alternatively, he argues that the evidence presented was insufficient for a conviction of an unlawful homicide.

"If the sufficiency of evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational

factfinder could have found defendant guilty beyond a reasonable doubt." *State v. Bowen*, 262 Kan. 705, 705, 942 P.2d 7 (1997) (citing *State v. Knighten*, 260 Kan. 47, Syl. ¶ 1, 917 P.2d 1324 [1996]).

A. Injury inflicted by Kirby.

Kirby contends that the evidence presented at trial contradicts the State's theory that the injury to Karen's ribs was caused by the beating he inflicted on her on December 19, 1998. He further asserts that the State failed to prove that Karen had a fractured rib or lacerated spleen on December 19, 1998.

"Murder in the second degree is the killing of a human being committed: . . . (b) unintentionally but recklessly under circumstances manifesting extreme indifference to the value of human life." See K.S.A. 2000 Supp. 21-3402. For a conviction of unintentional second-degree murder, the State must prove that the defendant unintentionally but recklessly, under circumstances showing extreme indifference to the value of human life, committed an unlawful act which proximately caused the death of a human being.

Kirby's argument centers on the idea that the State failed to prove that he inflicted the injuries to Karen's ribs and spleen that ultimately caused her death. However, the record does not reveal, and Kirby does not claim, that Karen or anyone else might have been responsible for those injuries. Ussery testified that Kirby's attack on Karen lasted for 30 to 40 minutes and that he saw Kirby hit and kick Karen all over. Packer testified that Kirby forcefully kicked Karen's left side three or four times with his boots. Christopher Way, a paramedic, testified that when he examined Karen that night, he noted an area of new bruising to the left side of her abdomen and left flank area. Janee took care of Karen from the time of her first dismissal from UKMC on December 20, 1998, until Karen's death 2 days later, but testified that Karen fell only once on Sunday, December 21 around 5:30 p.m. Karen tried to walk to the bedroom but collapsed, falling down on her knees. Janee did not describe any incidents where Karen's ribs were injured by falling.

In his brief, Kirby also argues that Karen did not have any fractured ribs at the time of her first visit to UKMC. Dr. Mitchell testified, however, that the rib fractures were non-displaced and

would be difficult to see on x-rays. Mitchell also testified that the bruises and rib fractures on Karen's left side were related to the damage to her spleen. Further, Mitchell stated that the blow that resulted in the damage to her spleen occurred within a few days of Karen's death.

Viewed in the light most favorable to the prosecution, this court is convinced that a rational factfinder could have found Kirby guilty beyond a reasonable doubt of inflicting the wounds that caused Karen's death.

B. Unlawful homicide.

Kirby argues in the alternative that the evidence "was insufficient to support a murder conviction because the actions of the [UKMC] medical personnel amounted to an efficient intervening cause" relieving him of criminal liability.

As was discussed above, the fact that another person acted negligently and contributed to the cause of the death is not a defense to a criminal charge. This court has stated that "a defendant will be found not responsible for the death which occurs during the commission of a felony only if an extraordinary intervening event supersedes the defendant's act and becomes the sole legal cause of death." *State v. Lamae*, 268 Kan. 544, 555, 998 P.2d 106 (2000).

Kirby never denied that he administered the beating that ultimately resulted in Karen's death. He only argued that the negligent acts of UKMC treating medical personnel relieved him of criminal liability for her death. Because we have found that the physicians' actions were not so unusual, abnormal, or extraordinary as to become unforeseeable, and that the physicians' negligence, if any, did not supersede the effect of the wounds inflicted by Kirby so as to become the sole legal cause cause of Karen's death, Kirby's argument fails.

## VI. CUMULATIVE TRIAL ERRORS

For his sixth assertion of error, Kirby argues that cumulatively the previously alleged errors have resulted in the denial of his right to a fair trial. The State disagrees.

" 'Cumulative trial errors, when considered collectively, may be so great as to require reversal of the defendant's conviction. The

test is whether the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial. No prejudicial error may be found upon this cumulative effect rule, however, if the evidence is overwhelming against the defendant.' " *State v. White*, 263 Kan. 283, 308, 950 P.2d 1316 (1997) (citing *State v. Lumbrera*, 252 Kan. 54, Syl. ¶ 1, 845 P.2d 609 [1992]).

Because we have found no error previously, Kirby's assertion of cumulative trial errors fails.

## VII. PRO SE MOTION FOR A NEW TRIAL

Kirby's final assertion of error is that his motion for a new trial was improperly handled and improperly denied without conducting an evidentiary hearing. Kirby sets forth three ways in which the trial court committed alleged errors.

"The court on motion of a defendant may grant a new trial to him if required in the interest of justice." K.S.A. 22-3501(1). "The granting of a new trial is a matter which lies within the sound discretion of the trial court, and appellate review of a trial court's decision denying a new trial is limited to whether the trial court abused its discretion. [Citation omitted.]" *State v. Franklin*, 264 Kan. 496, 498, 958 P.2d 611 (1998).

A. Failure to conduct an evidentiary hearing on ineffective assistance of counsel claims and failure to appoint conflict-free counsel for such a hearing.

First, Kirby contends that when he raised specific issues of ineffective assistance of counsel at the hearing on his motion for a new trial, the trial court should have (1) held a separate hearing and (2) appointed separate counsel to properly litigate his claim of ineffective assistance of counsel.

The jury verdict was entered in this case on November 16, 1999. In conformity with the 10-day time limitation of K.S.A. 22-3501, Kirby's counsel filed a motion for a new trial on November 30, 1999. On December 10, 1999, the date of the hearing of the motion for a new trial, Kirby filed a pro se amendment in support of the motion for a new trial, adding issues for review and an allegation of ineffective assistance of counsel.

The State contends that since Kirby's motion was not timely filed, this court should not review the merits of the issue. However, in *State v. Kingsley*, 252 Kan. 761, 851 P.2d 370 (1993), where the defendant failed to raise the issue of ineffective assistance of counsel in a timely fashion, this court viewed the pro se pleading as a post-conviction motion and proceeded to the merits of the defendant's claim. 252 Kan. at 765-66.

In *Kingsley*, this court noted that K.S.A. 22-4506 applies to determine a person's entitlement to appointment of counsel when he or she is in custody after felony conviction. It provided that "[i]f the court finds that the petition or motion presents substantial questions of law . . . the court shall appoint counsel . . . to assist such person." See K.S.A. 2000 Supp. 22-4506(b). Therefore, in *Kingsley*, we held: "[T]here is no statutory requirement for 'appointment of counsel at each and every post-trial motion . . . and such a decision rests within the sound discretion of the trial court.' [Citation omitted.] In post-conviction proceedings, there also is some latitude in the constitutional requirement that a defendant be represented at critical stages." 252 Kan. at 766-67.

The State notes that at the hearing Kirby asked his attorney to present his pro se requests to the court. On the record at the hearing, counsel for Kirby stated: "I was just informed by Mr. Kirby that he has added a list under the heading 'Amendment in Support of Request for a New Trial' at the conclusion of mine. My client has requested that I present this to the Court. I believe that I am obligated to do so upon his specific request."

Ordinarily, a litigant may not invite and lead a trial court into error and then complain of the trial court's action on appeal. *State v. Saleem*, 267 Kan. 100, 109, 977 P.2d 921 (1999). In *Kingsley*, however, this court mentioned that procedurally, the trial court should scrutinize the defendant's motion for signs of "a realistic basis," and if the motion appears to have merit, " 'then the trial in the exercise of its discretion should set the matter for hearing and appoint counsel to represent the defendant. . . .' [Citation omitted.]" 252 Kan. 767.

As to Kirby's claim that the trial court should have held a separate hearing on the issue of ineffective assistance of counsel, we recently stated:

> "When faced with either a motion to correct an illegal sentence or a motion alleging ineffective assistance of counsel, the district court is to make a preliminary examination to determine whether substantial questions of law or fact are raised, and if the findings are in the negative, the court may summarily deny the motion. The decision concerning whether to hold an evidentiary hearing on a motion to correct an illegal sentence is subject to an abuse of discretion standard." *State v. Davis*, 271 Kan. 892, Syl. ¶ 1, 26 P.3d 681 (2001).

Therefore, we review the actions of the trial court for an abuse of discretion in summarily denying his motion for a new trial based on ineffective assistance of counsel and not appointing separate counsel when it determined Kirby's motion lacked merit.

B. Alternative claim that Kirby was denied effective assistance of counsel at trial.

Kirby's second assertion of error is that he was denied effective assistance of counsel and should be granted a new trial. This court must necessarily review the trial court's determination in this regard as mentioned above.

> "Before counsel's assistance is determined to be so defective as to require reversal of a conviction, defendant must establish (1) counsel's performance was deficient, which means counsel made errors so serious that counsel's performance was less than that guaranteed by the Sixth Amendment, and (2) the deficient performance prejudiced the defense, which requires showing counsel's errors were so serious they deprived defendant of a fair trial." *State v. Hedges*, 269 Kan. 895, 913, 8 P.3d 1259 (2000).

Kirby's pro se pleading for a new trial stated:

> "10) Ineffective assistance of counsel caused prejudice to defendant in the following ways:
> A. Failure of counsel to bring up victim's past in regards to her violent history.
> B. Failure to put subpoenaed witnesses on the stand in support of defense.
> C. Failure to comply with defendant's request to pursue certain issues defendant believes crucial to his defense."

A more thorough discussion of the issues Kirby has complained of was presented to the court at the hearing. There, counsel for Kirby stated:

> "According to the diligence rule, 1.3 in the Kansas Courtroom Rules and Procedures, a lawyer should pursue a matter on behalf of client despite opposition, instruction or person's inconvenience to the lawyer and take whatever measures required if indicated client's causes of endeavor.

. . . .

"Victim had numerous assault and battery charges on both male and female and had been ordered by the Court to complete anger control classes. Defendant states this information could have helped the jury get a profile of the victim's tendencies.

"Defendant claims prejudice by counsel issuing subpoenas to witnesses for defense, to wit: Mark Gaskel (phonetics) and Tony Baird (phonetics).

"Mark Gaskel would have given testimony that would have impeached the testimony given by the State's witness, to wit: Lori Packer, thus affecting the credibility of Ms. Packer.

"Mr. Baird's testimony would have discredited Michael Weddington's testimony in regard to the incident in Overland Park. Mr. Baird's testimony would have shown the victim as the aggressor, not the defendant.

"Finally, defendant claims prejudice by counsel's refusal to pursue issues crucial to the defense of the defendant. Defendant wanted counsel to compare the time of arrival by the police officers to the length of supposed beating—of the supposed beating that the State's witnesses, to wit: Lori Packer, testified to. The defendant relies on *State v. Clark* in that the comparison in time would show a lack of malice and intent to support the charge.

"Counsel also failed to cross-examine an Overland Park police officer in regards to the tire tracks at the scene of the incident that the officer testified to which would influence testimony given about the defendant trying to run the victim over.

"In closing, the counsel of defendant refused to question State witness, to wit: Janee Grote, in regards to the victim falling on the coffee table. That may have caused the broken ribs that were not discovered by two examinations performed at Kansas University Medical Center which State's witness, to wit: Dr. Mitchell, ruptured victim's spleen which resulted and caused the defendant [sic] thus persuading the jury that defendant was not responsible for cause of death."

The trial court reviewed Kirby's claims and found that the only way for counsel to properly bring out Karen's violent history was for Kirby to claim self-defense, which was not the case here. As to the allegation that counsel failed to subpoena witnesses, the court said:

"[A]gain, I believe that that goes to the issue of trial strategy in this particular case. What witnesses to call and what witnesses not to call are basically within the sound discretion of the defense counsel in this particular case. You have to weigh what that witness is going to testify to, what the effect of that testimony is going to be, whether that would be beneficial or harmful. And I have not heard anything that there was any critical evidence here that was kept from these jurors, and I would defer to [defense counsel's] judgment as to what witnesses to call and what witnesses not to call."

The trial court also found that the failure to concentrate on the length of time that the beating took place was an issue of trial strategy. The court concluded that counsel for Kirby was very effective in arguing the case to the jury, and noted that although Kirby was charged with premeditated first-degree murder, the jury found him guilty of unintentional second-degree murder. Therefore, the trial court denied Kirby's motion for a new trial.

Reasonable minds could agree with the trial court that the motion had no reasonable basis. The trial court did not abuse its discretion in finding that the performance of Kirby's trial counsel was not deficient and that Kirby was not prejudiced or deprived of a fair trial. Thus, Kirby's claim of ineffective assistance of counsel fails.

C. Failure to conduct an evidentiary hearing on claim that jurors were dozing during portions of the trial.

Kirby contends that because the Sixth and Fourteenth Amendments to the United States Constitution require that a criminal defendant not be tried by a juror who cannot comprehend testimony, the court also erred in failing to conduct an evidentiary hearing "to determine what and how much of the testimony may have been lost on the jury."

"The Sixth Amendment to the United States Constitution guarantees that in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial by an impartial jury." *State v. Jenkins*, 269 Kan. 334, 337, 2 P.2d 769 (2000).

> "An appellate court's review of an order denying a motion for a new trial or a motion to recall a jury is limited to whether the trial court abused its discretion. If a defendant's constitutional right has been violated during a trial, a judge's discretion to deny a motion for a new trial or a motion to recall a jury is limited. At this point, there is a greater reason for the judge to articulate the reasons for his or her 'discretionary' decision. A trial court abuses its discretion when it denies a motion for a new trial based on juror misconduct if the defendant can show that (1) an act of the jury constituted misconduct and (2) the misconduct substantially prejudiced the defendant's right to a fair trial. [Citation omitted.]" 269 Kan. at 338.

Kirby's concerns over the inattentiveness of jurors seven and nine during portions of the trial were brought to the attention of

the trial court. Both attorneys and the judge remembered having a bench conference on the matter, but Judge Boeding and counsel for the State noted that only one juror was dozing. In regard to the issue of juror inattentiveness, Judge Boeding stated:

"This issue about the jurors sleeping, it was brought to the Court's attention during the course of the trial that one juror appeared to be nodding off. The record I think should reflect if it doesn't already that this courtroom was extremely hot during most of that trial and the temperature in the courtroom—I mean—and I did keep a fairly close eye on the jurors. I always do that, and particularly when it is warm. We did have that one incident, I kind of watched that particular juror and he was an individual that tended to close his eyes as he was listening. But at one point it did appear that he may have nodded off for a moment, and I think we took that appropriate action. And thereafter there was certainly no one that I observed who was not paying attention and certainly nothing was brought to the Court's attention."

On appeal, Kirby cites *State v. Hayes*, 270 Kan. 535, 17 P.3d 317 (2001), to support his argument that the Constitution requires that a criminal defendant not be tried by a juror who cannot comprehend testimony. In that case, the defendant moved for a mistrial during jury deliberation after a juror requested a copy of the transcript of the defendant's testimony. This court reversed the trial court's denial of defendant's motion for a mistrial, finding that the defendant's constitutional rights to an impartial jury and due process were infringed because the juror specifically stated that he could not hear any of the defendant's testimony, and the trial court failed to cure the error by performing a "readback" of testimony. 270 Kan. at 540.

The State argues that because no contemporaneous objection was raised at trial, Kirby should be deemed to have waived his argument. While the State would be correct in regard to the admissibility of evidence, such is not the case when the issue is juror misconduct.

Here, there was no statement by the juror that he did not hear testimony. The trial court was aware of the juror's tendency to close his eyes as he listened, kept an eye on the juror, and took a recess when it appeared that the juror was dozing off. Unlike the juror in *Hayes* who heard no part of the defendant's testimony, the trial court characterized the length of time the juror dozed here as mo-

mentary and the judge did not observe any further dozing incidents following the recess.

Therefore, we find that the trial court did not abuse its discretion when it denied Kirby's motion for a new trial based on juror misconduct.

Affirmed.

DAVIS, J., not participating.

BRAZIL, Chief Judge Retired, assigned.