IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 126,757

STATE OF KANSAS,
*Appellee*,

v.

JEFFREY JAMES EXON,
*Appellant*.

SYLLABUS BY THE COURT

1.

Although defendants have a constitutional right to present evidence that is integral to their defense, the right to present evidence supporting such theories is subject to statutory rules and caselaw interpretation of rules of evidence and procedure.

2.

Under K.S.A. 60-456(b), a trial court acts as an evidentiary gatekeeper by assessing the reliability and relevance of expert testimony.

3.

Whether the trial court properly performed its evidentiary gatekeeper role is reviewed on appeal for abuse of discretion.

4.

One key component of the trial court's gatekeeping role is to ensure that expert testimony is relevant.

1

Appeal from Shawnee District Court; JESSICA HEINEN, judge. Oral argument held December 17, 2025. Opinion filed April 17, 2026. Convictions affirmed, sentence vacated in part, and case remanded with directions.

*Kristen B. Patty*, of Wichita, argued the cause and was on the brief for appellant.

*Carolyn A. Smith*, assistant deputy district attorney, argued the cause, and *Michael F. Kagay*, district attorney, and *Kris W. Kobach*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

ROSEN, C.J.: Jeffrey James Exon appeals from his convictions and sentence for first-degree felony murder, failure to report the death of a child, and aggravated endangering a child, all stemming from the death of his two-year-old daughter.

Exon and S.N. had two children together, T.E., born in 2016, and A.E., born in 2018. S.N. broke up with Exon in February 2019 and took both children with her. Concerned about her own ability to provide a stable home, in the summer of 2019 she voluntarily gave Exon custody of both children. Although she had unlimited visitation rights, she did not visit the children often because she moved in with her father in St. Mary's, about 30 miles from Exon's house in Topeka, and she did not always have a car available. She did not visit her children in person at all during the height of the COVID pandemic in 2020, limiting her interaction with them to electronic communications. She thought Exon was sober during the time he had custody, and she had no concerns about his parenting practices.

G.S. began a romantic relationship with Exon in July 2019. She lived with him for a short time, from September until the middle of November 2019. After that, she moved into her own place but they remained in an on-again-off-again romantic relationship. In November 2020, Exon underwent neck surgery, and G.S. and her mother, S.S., moved

2

into his home around that time to take care of him and the children. He began using medication to control the pain he experienced after the surgery. G.S. testified she broke up with Exon because she did not want to be with an alcoholic any longer. The last time G.S. saw Exon was December 12, 2020, and the last time S.S. saw Exon was December 23, 2020.

During the course of her short life, A.E. had significant ups and downs in terms of gaining weight relative to predictions based on her birth size and weight. Both S.N. and Exon took her in for regular medical exams and treatment for a total of 18 visits during her life. At her nine-month visit on February 28, 2019, she had lost weight while she was in her mother's custody, although this was attributed to a flu infection. At her one-year visit, she was back to eating and was gaining weight. The pediatrician who saw her at her two-year wellness visit described her as "a happy, healthy child."

Exon called the medical office in August 2020 and again in late October 2020 because he was concerned about A.E. experiencing ongoing constipation. At a November 2, 2020, medical visit, Exon told the medical staff that A.E. was not wanting to eat and she was suffering from constipation. Although the nurse practitioner who saw them did not have concerns that A.E. was malnourished and she saw no need to report any concerns to the Department for Children and Families, she was concerned about how to increase A.E.'s calorie intake. She gave Exon 48 bottles of a protein supplement called PediaSure, which A.E. was to consume at the rate of two bottles a day. Exon called the office again after A.E. was seen by a cardiologist because she had lost 2 pounds. The pediatrician told Exon to monitor A.E.'s weight and to schedule a 30-month well-child checkup.

At the December 8, 2020 wellness visit, the nurse practitioner reported that A.E. was normal in appearance, alert, and pleasant. She did not appear ill and showed no signs

of distress. She was very happy, playful, and hugging on her father. Her weight had declined, however, to the 13th percentile relative to her expected weight.

In December 2020, T.E. began to miss school frequently. Back in October 2020, an incident occurred when Exon was scheduled to meet T.E. at the bus drop-off after his Head Start schooling. Exon showed up late and appeared to the bus driver to be intoxicated, exhibiting aggression and stumbling and wandering as he walked. A Head Start family service coordinator contacted Exon, and he explained to her he was on medicine for his neck and he had taken a drink of alcohol at lunch.

Exon's brother saw A.E. on Christmas day, when her behavior seemed normal and she was opening gifts and got excited about some dolls. She ate at the dinner table with Exon and his family. S.N. picked up the children in the early afternoon that day and returned them to Exon on the evening of December 26. According to S.N., A.E. looked okay and was feeding herself during that time.

On the morning of January 4, 2021, a Topeka police officer responded to a call for a welfare check at Exon's home. Exon's parents had called in the request after Exon had failed to respond to text messages or answer his phone for a while. The officer saw Exon's parents and then saw Exon outside the house and asked him if he was all right. He said everything was fine. Because there appeared to be no problem, the officer did not go in the house to investigate further.

The next morning, Exon called his father and told him A.E. was dead and CPR would not help because "she's been gone for a while." The same officer who had visited the house the day before was dispatched to Exon's house to respond to a report that a child had died in the house. She found a dead girl on the couch in the living room. Exon

told her that January 2 was the last time he interacted with her when "she was alert." He told her that he had changed her diaper on January 3 or 4.

An inspection of the house turned up drawers containing empty vodka bottles. Many of the PediaSure bottles were unopened. The investigation also confirmed Exon's statements that there were many locked childproofing gates set up around the house to keep the children out of the kitchen and in their respective rooms.

Pathologist Dr. Altaf Hossain performed an autopsy on January 6, 2021. He described the baby as "emaciated"; she had lost fatty tissue and was dehydrated. She had not received enough nutrients, her stomach was empty, and there was no food in her bowels. The pathologist found no sign of traumatic injury and listed the cause of death as marasmus, "starvation or deprivation of nutrition and hydration." The pathologist opined that the malnourishment had probably been going on for a couple of months, and A.E. was probably suffering from malnutrition as recently as December 8, 2020, when health care providers last saw her. He declared the cause of death was homicide. Based on the signs of early decomposition of A.E.'s body, the pathologist speculated she had died less than 7 to 10 days before the autopsy.

S.S. testified that several months after A.E. died, T.E. told her what had happened at the end of December. Exon locked them in their rooms for three days. He brought T.E. a plate with cereal on it and left it at the bottom of the stairs from T.E.'s bedroom and locked the child gates. When T.E. asked for milk, Exon gave him water. Exon would not let T.E. see A.E.

The State charged Exon with one count of felony murder, with aggravated endangering a child as the underlying felony; one count of reckless second-degree murder; one count of aggravated endangering a child; and one count of failure to report

the death of a child by a parent, guardian, or caretaker. A jury found him guilty of all counts.

At sentencing, the court merged the conviction for second-degree murder into the conviction for first-degree felony murder. The court announced from the bench a sentence of life in prison without the possibility of parole for 653 months for the murder conviction. For failure to report the death of a child, Exon received a sentence of 23 months. For aggravated endangering a child, he was sentenced to a term of 7 months. These sentences are to run consecutive.

*Exclusion of Expert Testimony*

Exon argues that the trial court impaired his ability to present a complete defense when it prohibited his expert witness from giving her opinion that A.E.'s medical providers committed malpractice when they did not intervene more aggressively in determining why her growth was not keeping up with projected expectations and when they did not initiate an investigation by child protective services.

Defendants have both a state and federal constitutional right to present a defense. See *State v. J.L.J.*, 318 Kan. 720, 737, 547 P.3d 501 (2024). Exclusion of evidence that is integral to a defendant's theory of defense violates a defendant's fundamental right to a fair trial. See *State v. Evans*, 275 Kan. 95, 102, 62 P.3d 220 (2003). But the right to present evidence supporting a defendant's theory is subject to statutory rules and caselaw interpretation of rules of evidence and procedure. See *Evans*, 275 Kan. at 102.

Under K.S.A. 60-456(b), a trial court acts as an evidentiary gatekeeper by assessing the reliability and relevance of expert testimony. See *State v. Aguirre*, 313 Kan. 189, 196, 485 P.3d 576 (2021). Whether the trial court properly performed this

gatekeeper role is reviewed on appeal for abuse of discretion. See generally *Manhattan Ice & Cold Storage, Inc. v. City of Manhattan*, 294 Kan. 60, 274 P.3d 609 (2012). The reviewing court must first determine whether the trial court used the correct legal standard governing the admissibility of expert testimony. It then applies that legal standard to evaluate whether the expert is qualified to render an opinion and whether the opinion is sufficiently relevant and reliable. *Aguirre*, 313 Kan. at 198.

Ensuring that expert testimony is relevant is a key component of the trial court's gatekeeping role. See *State v. Lyman*, 311 Kan. 1, 22, 455 P.3d 393 (2020); *Aguirre*, 313 Kan. at 198; *Mooney v. City of Overland Park*, 283 Kan. 617, 619-20, 153 P.3d 1252 (2007).

In pretrial orders, the trial court specifically forbade Dr. Santa Bartholomew from testifying that the failure of medical care providers to carry out a more thorough investigation of A.E.'s weight loss was "medically negligent." This was language contained in the doctor's original report. The trial court also excised from Dr. Bartholomew's report her opinion that more assertive medical care during A.E.'s second year of life would probably have saved her life. Finally, the court did not allow Dr. Bartholomew to give her opinion about the importance of carrying out an assessment of the child's home and family dynamics, typically performed by the Department for Children and Families. We note as an aside that Dr. Bartholomew's testimony ultimately included the essence of what the court had prohibited her from saying explicitly.

Although the trial court provided various reasons for excluding the proffered evidence, we conclude that the evidence was properly excluded because it failed to satisfy the relevance requirement for admissibility.

Contributing factors by other parties do not diminish a defendant's culpability for a criminal act.

> "[W]hen a defendant acts with the requisite mens rea, and that act sets events in motion that lead to a victim's death, the defendant will be criminally liable for the death unless an unforeseeable event supersedes the defendant's act and becomes the sole cause of death, thus breaking the chain of proximate causation." *State v. Wilson*, 308 Kan. 516, 526, 421 P.3d 742 (2018).

In criminal cases, a victim's or third party's act will cut off criminal liability only if it is the sole legal cause of harm. *State v. Kirby,* 272 Kan. 1170, 1183, 39 P.3d 1 (2002).

Even if the jury had heard and believed all of Dr. Bartholomew's proffered testimony, Exon would not have been absolved of guilt for neglecting a nutritionally challenged child for several days while she succumbed to dehydration and lack of calories. The issue here is not whether Exon intended to kill his daughter or whether medical personnel could have taken better preemptive steps; it is whether he criminally neglected her in such a way that her death was the result of his neglect. Nothing in Dr. Bartholomew's proffered testimony challenged that conclusion.

Indeed, Dr. Bartholomew's report and testimony supported the State's theory that Exon's neglect was a causative factor in A.E.'s death. Her report concluded that Exon had "some culpability in the death of his daughter, especially in the last three days of her life when she became more and more lethargic." Her report stated that most parents of a two-year-old actively feed their child multiple times in a day and do not just leave food out for them. She told the jury that at A.E.'s age she would not be "independent at this developmental age to be feeding independently." And Dr. Bartholomew included in her report that physical evidence showed A.E. had been dead for a prolonged period before anyone contacted emergency authorities.

The trial court did not abuse its discretion when it fulfilled its gatekeeping duties to exclude irrelevant evidence. Dr. Bartholomew's report and testimony about failure by health care providers to take a more aggressive intervention in A.E.'s care was not relevant to the question of whether Exon criminally neglected his daughter to such an extent that she died as a result. The doctor's testimony did not provide a defense to the charges.

We find no error in the exclusion of the proffered evidence and no abuse of discretion by the trial court. We therefore affirm the convictions.

*Erroneous Journal Entry of Sentencing*

At sentencing, the court merged the conviction for second-degree murder into the conviction for first-degree felony murder. The court announced from the bench a sentence of life in prison without the possibility of parole for 653 months for the murder conviction. For failure to report the death of a child Exon received a sentence of 23 months. For aggravated endangering a child, he was sentenced to a term of 7 months. These sentences are to run consecutive. The sentencing recap in the journal entry of sentencing, however, stated the total prison term was life without the possibility of parole until 683 months are served.

Sentences are effective when they are pronounced from the bench. See *State v. Johnson*, 320 Kan. 246, 248, 564 P.3d 782 (2025). A judge's oral pronouncement of sentence controls over a conflicting written journal entry, which creates a clerical error that may be corrected at any time. *State v. Edwards*, 309 Kan. 830, 835-36, 440 P.3d 557 (2019).

9

The entry of a 683-month sentence, aggregating Exon's guideline sentences onto his indeterminate life sentence, was improper and should be considered a clerical error. The appropriate remedy for such a discrepancy between the oral pronouncement of sentence and the journal entry is correction through an order nunc pro tunc. See *Johnson*, 320 Kan. 246, Syl.; K.S.A. 22-3504(b). The case is remanded with directions to issue a new journal entry of sentencing consistent with this opinion.

Convictions affirmed, sentence vacated in part, and case remanded with directions.

LUCKERT, J., not participating.