NOT DESIGNATED FOR PUBLICATION

No. 114,947

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

MANUEL A. RIVAS,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; ERIC YOST, judge. Opinion filed July 28, 2017. Conviction affirmed, sentence vacated, and case remanded with directions.

*Clayton J. Perkins*, of Kansas Appellate Defender Office, for appellant.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before HILL, P.J., MCANANY and ATCHESON, JJ.

*Per Curiam*: Manuel A. Rivas shot Eric Salazar in the head and killed him. Convicted of second-degree intentional murder, Rivas brings this appeal, raising three trial errors and one sentencing error. Because Rivas has failed to convince us that there are any reversible trial errors, we affirm his conviction. But because there is insufficient evidence in the record to show Rivas was represented by counsel in two of the four cases the court used in computing his criminal history score, we vacate his sentence and remand the case for the imposition of a new sentence.

1

*Armed, Rivas enters Salazar's apartment.*

Three witnesses, Gerardo Reyes, Marino Mejia, and Miguel Sotello told the jury what they saw around midnight on either November 5 or November 6, 2013, in Eric Salazar's Wichita apartment. They testified for the State. On Rivas' behalf, Michell Rodriguez' video recorded deposition was given to the jury. As can be expected, their accounts of what happened differ. We offer summaries of their testimonies and some forensic evidence to provide a context to help understand our holding concerning Rivas' claims of jury instruction error and prosecutor error.

**Gerardo Reyes' testimony:**

Reyes went to Salazar's apartment to have Salazar fill out paperwork relating to a bail bond. Reyes had brought his puppy with him to the apartment. Reyes and Salazar were sitting at a kitchen table in the apartment working on the papers. Reyes had his puppy in his lap when Rivas and a man later identified as Jeremy Anspach entered the apartment. Reyes saw that Rivas had a gun in his hand when he entered the apartment. The gun was possibly in Rivas' left hand, but Reyes was unsure. Salazar did not have a weapon with him.

Shortly after the two entered the apartment, Rivas and Salazar began exchanging words. Reyes remembered they argued about an amount of money—possibly $30—and a car. Salazar told Rivas to put the gun down and fight him like a man. Rivas generally held the gun at his side, pointed at the floor; however, he did gesture around in the air with the gun. When Salazar tried to get out of his seat, Rivas pushed him back down. After being pushed down, Salazar got back up.

Reyes said he tried to calm the situation down, but in his opinion, it only got worse. Reyes began to put his puppy on the floor, and while doing this he saw Salazar

2

reach for Rivas' hand that held the gun. The two struggled over the gun. During this struggle, Reyes saw Anspach pull something out which may have been a gun, but Reyes was unsure what the item was.

During the struggle, Rivas had the gun pointed at the ceiling. Reyes saw Rivas point the gun downward, toward Salazar's head. Reyes saw Rivas shoot Salazar in the head. Reyes did not see Anspach shoot Salazar.

When the gun fired, Reyes' puppy ran off and Reyes chased after him. While chasing the puppy, Reyes hid outside the apartment and heard two people run past him. He identified them as Rivas and Anspach. Reyes heard Rivas say, "I got him." Reyes called 911.

**Marino Mejia's testimony:**

The second witness was Marino Mejia, a friend of Salazar who was sleeping at Salazar's apartment. Mejia had gone to the bathroom, which was close to the kitchen. While in the bathroom, Mejia heard loud talking. He heard Salazar say, "For $2." He also heard Salazar say, "If you have the gun, use it." When Mejia opened the door and walked out of the bathroom, he saw Rivas shoot Salazar.

Mejia did not see Anspach in the kitchen. Mejia may have told an officer who initially interviewed him that he only heard the gunshot while he was in the restroom. However, this may have been a misunderstanding due to language difficulties between the officer and Mejia. During a more thorough police interview, Mejia told the officer that he was in the bathroom and heard arguing. He opened the door and saw Rivas point a gun at Salazar's head and then pulled the trigger.

3

**Miguel Sotello's testimony:**

The third eyewitness called by the State was Miguel Sotello. During the night of the shooting, Sotello was sitting in the living room adjacent to the kitchen. He heard Rivas and Salazar arguing over $2. Approximately 30 seconds had elapsed from the time Rivas entered the apartment until the argument began. Rivas had a gun in his hand, which Sotello stated looked like a MAC-10 or MAC-11. Sotello heard Salazar tell Rivas to put the gun away and fight him. He saw Salazar try to take the gun away from Rivas. While this struggle was occurring, Sotello hid behind a portion of the wall to avoid a stray bullet. Sotello heard a gunshot and saw Salazar fall to the ground. Then he saw Anspach dragging Rivas out of the apartment, and Rivas was saying the word "no" repeatedly, as if he had done something wrong.

Sotello ran away but eventually returned to the apartment. He told the police that Rivas was the shooter. He did admit that he did not see Rivas shoot Salazar.

**Michell Rodriguez' testimony:**

Rodriguez was in the kitchen on the night of the shooting. According to her, only she and Salazar were in the kitchen when two men entered the apartment. Other people had been present in Salazar's apartment earlier in the night, but they had left. She identified Rivas as one of the men who came in, but she did not identify the other man.

Rodriguez saw Rivas and Salazar get into an argument. She said that Salazar and Rivas were not "in each other's face," during the argument. Rodriguez saw the unidentified man had a firearm pointed in the direction of the argument. The unidentified man fired his weapon, and Rodriguez saw Salazar on the floor.

4

**Forensic evidence:**

In addition to the eyewitness testimony, other facts were presented to the jury. Salazar's body was located partially in the kitchen and partially in the living room of his apartment. A large bloodstain was located in the living room, near Salazar's head.

The wall that separated the kitchen and the bedroom had a bullet hole in it. Based on the position and the path of the bullet through the wall, a crime scene investigator stated that the bullet entered the wall at a downward angle. A photograph with a fiberglass rod showing the path of the bullet through the wall was presented to the jury. Two bullet fragments were located in Salazar's apartment—one in the bloodstained area of the living room and one in the bedroom that was separated by a kitchen wall. The bullet fragment found in the bedroom was in line with the bullet hole in the wall.

The postmortem examination of Salazar's body showed that he had sustained a gunshot wound to the head and bruising on his face, left arm, and left leg. Salazar had two wounds to the head—one was an entry wound and the other was where the bullet exited. The entry wound was on the top side of Salazar's skull, and the exit wound was on the lower right, backside of Salazar's head. The bullet appeared to travel in a straight path through Salazar's skull and brain. The medical examiner determined the cause of death was a gunshot wound and the manner of death was homicide.

The medical examiner was not able to determine how far away the gun was from Salazar when it was fired. It was unlikely that the gun was in contact with Salazar when it was fired, because there were no markings on his skin, which would be consistent with the gun being fired in this way. Ultimately, the medical examiner concluded the shot was fired from an indeterminate range.

A jacket that Rivas was wearing on the night of the shooting was tested for the presence of blood. The test came back positive for blood. The lab worker then tested that spot of the jacket for the presence of DNA.

The testimony revealed, in the double negative terms often used in such analysis, that Salazar "cannot be excluded as a major contributor" for the DNA from that spot on the jacket. The analysis showed that the blood had a 1 in 61.4 quintillion chance of being a random match within the Caucasian population; a 1 in 3.43 sextillion chance of being a random match in the African-American population; and a 1 in 5 quintillion chance of being a random match in the Hispanic population. In other words, it was extremely unlikely that the DNA from that blood spot on Rivas' jacket was from anyone other than Salazar.

*We examine the trial error claims.*

Rivas' first argument on appeal is that the district court committed plain error by not instructing the jury on voluntary manslaughter. Next, he argues that the prosecutor, during closing argument, committed prosecutorial error by making several erroneous statements about the forensic evidence. For his final trial error, Rivas contends that the district court erred in denying his motion for a mistrial based upon alleged juror misconduct—sleeping during the presentation of evidence. We will address these claims in that order and then conclude with our analysis of what we perceive to be the problem with the sentence imposed by the court.

*The facts did not call for a voluntary manslaughter instruction.*

Rivas argues the fight in Salazar's kitchen provided adequate provocation to lessen his killing to manslaughter. At trial, Rivas did not request an instruction on voluntary

6

manslaughter. Thus, this court's review is limited to reviewing for clear error. See *State v. Kershaw*, 302 Kan. 772, 776, 359 P.3d 52 (2015).

We use a two-step process when reviewing for clear error. First, we ask, was the failure to give an instruction erroneous? Second, was the defendant prejudiced by the failure to give the instruction? In other words, are we firmly convinced that the jury would have reached a different verdict had the instruction error not occurred? See *State v. Trujillo*, 296 Kan. 625, 630, 294 P.3d 281 (2013).

The law is well settled on jury instruction errors. In order for the district court to err in failing to give a jury instruction, the challenged jury instruction must both be legally and factually appropriate. *State v. Williams*, 295 Kan. 506, Syl. ¶ 4, 286 P.3d 195 (2012).

Voluntary manslaughter is a lesser included offense of second-degree murder. *State v. Hayes*, 299 Kan. 861, 864, 327 P.3d 414 (2014). The district court must instruct on a lesser included offense "where there is some evidence which would reasonably justify a conviction of some lesser included crime." K.S.A. 22-3414(3). Essentially, an instruction on a lesser-included offense can be a legally appropriate instruction. This question becomes, however, whether there is a factual basis to instruct the jury on voluntary manslaughter in this case.

Essentially, voluntary manslaughter is defined as "knowingly killing a human being committed . . . [u]pon a sudden quarrel or in the heat of passion." K.S.A. 2013 Supp. 21-5404(a)(1). Voluntary manslaughter based upon a sudden quarrel or a heat of passion requires two essential elements: (1) a knowing killing—formerly an intentional killing—and (2) sufficient provocation. See K.S.A. 2013 Supp. 21-5404(a); *State v. Gallegos*, 286 Kan. 869, 874-75, 190 P.3d 226 (2008).

7

At issue in this appeal is the element of sufficient provocation. Rivas argues that the fight over the weapon in Salazar's kitchen provided sufficient provocation to support a manslaughter instruction.

Past cases have held that the provocation for voluntary manslaughter "must be such a degree as would cause an ordinary man to act on impulse without reflection." *State v. Guebara*, 236 Kan. 791, 796, 696 P.2d 381 (1985). Whether provocation is adequate is reviewed from an objective viewpoint. *Gallegos*, 286 Kan. at 874-75. Essentially, the provocation must be a stimulus that would cause an ordinary man to act out of passion rather than reason.

A sudden quarrel between two persons can provide adequate provocation for voluntary manslaughter. See K.S.A. 2013 Supp. 21-5404(a)(1). Our Supreme Court has looked to the common meaning of words in defining sudden quarrel. Sudden in the meaning of this statute requires the action occur without warning or be unforeseeable. A quarrel is "'[a]n altercation or angry dispute; an exchange or recriminations, taunts, threats, or accusations between two persons.' Black's Law Dictionary 1363 (9th ed.)" *State v. Johnson*, 290 Kan. 1038, 1048, 236 P.3d 517 (2010).

In *State v. Northcutt*, 290 Kan. 224, 234, 224 P.3d 564 (2010), the court held a jury instruction on voluntary manslaughter was not factually supported when the defendant initially instigated a confrontation with the victim by "'kick[ing] him in the butt.'" Because the defendant instigated the altercation and there was no evidence of provocation of the defendant by the victim, a jury instruction on voluntary manslaughter was not warranted. 290 Kan. at 234-35. In other words, there was not a sufficient provocation by the victim that caused the defendant to lose control of his actions.

The record here contains nothing that shows Salazar acted in a way that would cause a reasonable person to lose control over his or her actions. Actually, similarly with

8

the facts in *Northcutt*, Rivas was the instigator of the argument. See 290 Kan. at 234. The State's witnesses stated that Rivas entered the apartment with a gun in his hand. Shortly after entering the apartment, Rivas began a heated exchange with Salazar over a small amount of money—either $2 or $30—and potentially a vehicle. When Salazar attempted to stand up, Rivas pushed him back into his chair. Salazar attempted to deescalate the situation by telling Rivas to put the gun down and fight him. Based upon Rivas' actions of bringing a gun into Salazar's apartment and starting an argument, he was the instigator of the altercation and a voluntary manslaughter instruction is not warranted. See 290 Kan. at 234.

Rivas argues on appeal that the physical altercation itself is enough to justify a voluntary manslaughter instruction. We find no dispute that Rivas and Salazar wrestled for control over the weapon. But this wrestling is not sufficient to be considered adequate provocation. See *State v. Mitchell*, 269 Kan. 349, 353, 7 P.3d 1135 (2000). In order for a quarrel to be adequate provocation, the quarrel must be sudden and the altercation must be unforeseeable. *Johnson*, 290 Kan. at 1048. Without a doubt, it is reasonably foreseeable that a person would attempt to disarm someone with a gun who started an argument with them. Because Salazar's attempt at disarming Rivas was foreseeable and a direct result of Rivas' decision to bring a gun with him, the altercation does not meet the requirements for a sudden quarrel. See 290 Kan. at 1048.

After further reflection, even if wrestling over the gun would be considered a "sudden quarrel," it is not necessarily an adequate provocation. The question is whether wrestling over the gun would lead an ordinary person to act on impulse and lose control of his or her actions and reason. This situation is similar to the facts in *State v. Simkins*, 269 Kan. 84, 87, 3 P.3d 1274 (2000). In *Simkins*, the defendant confronted the victim with a loaded shotgun in an attempt to keep the victim away from the defendant's wife. The victim grabbed the shotgun, and the shotgun fired and killed the victim. The court held, "It is clear that [the victim's] alleged act in attempting to grab the shotgun from [the

9

defendant] would not pass [the test for sufficient provocation]." 269 Kan. at 90. Here, Salazar's action of attempting to disarm Rivas is similar to the victim attempting to grab the shotgun in *Simkins*. A person attempting to defend himself or herself from an attacker would not cause an ordinary person to lose control of his or her reason and instead act on impulse.

Thus, an instruction on voluntary manslaughter is not factually supported and the district court did not err by not instructing the jury on voluntary manslaughter. See *Williams*, 295 Kan. 506, Syl. ¶ 4. Because the instruction is not factually supported, reaching the second step of the clearly erroneous analysis—prejudice—is not necessary. See, *e.g.*, *Hayes*, 299 Kan. at 866.

*We find no prosecutor error in the closing argument.*

Rivas challenges two types of statements made by the prosecutor. The first involves the forensic evidence itself and the conclusion of where the gun that fired the fatal bullet was located. The second set of statements involves assessing witness credibility based upon the forensic evidence. We will take them up in that order, but first we recite the law that guides us on this point.

In analyzing a claim of prosecutorial error, we must determine if error is present, and if error is present, whether the error is prejudicial. Error occurs if actions of the prosecutor fall outside the wide latitude afforded to the prosecutor in seeking a conviction. An error is prejudicial if the State cannot demonstrate that there is no reasonable probability that the error affected the outcome. *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

The first challenged statement occurred during the State's initial closing argument where the prosecutor talked about science and the path of the bullet:

10

"What is also documented from science? The path of the bullet. Why is that important? Because it tells us where the gun was. Look at the line, extrapolate the line out from the hole going through the wall, all the way across the kitchen. That's where the gun has to be. No matter how high you raise it, no matter how low you go, it's on the angle that the bullet went through Eric Salazar's head, it went through the wall and it's found in the master bedroom. That's where the gun is. That's what the science tells you."

In rebuttal, the prosecutor also discussed the location of the gun:

"Let's look at this (indicating). Here's where the bullet hole is in the other room (indicating). Here's the line it came from; right? Bullet traveled in a straight line, went from a downward angle (indicating), it ends up basically—this line extended into the bedroom (indicating)—it goes straight through Eric Salazar's head. No evidence it deflected and went a different direction, no evidence at all. Okay. So guns got to be there (indicating). Not only does the gun got to be there, it's got to be pretty close to where Eric Salazar's feet were when he was shot. How do we know his feet were there? They're still there when they pick up his body; right? He dropped right where he was shot. And it's on line with where the gun was."

Rivas contends that the prosecutor never presented any evidence on the ability to extrapolate the location of the gun from the bullet holes and bullet fragment locations. Additionally, Rivas argues that the State did not present evidence on how the bullet's path was affected by the bullet hitting both Salazar and the wall. Rivas claims the above statements went beyond the forensic evidence that was introduced.

The record reveals that the State introduced some evidence of the path of the bullet. Through the crime scene investigator, the State introduced photographs showing an orange fiberglass rod inserted into the bullet hole, which was in the wall. The crime scene investigator testified about the precise location of that bullet hole and the path the bullet took as it was going through the wall. The crime scene investigator did not testify concerning the location of the gun when it was fired. Additionally, the medical examiner

11

was not able to determine the distance between Salazar and the gun when it was fired. The medical examiner did demonstrate the path the bullet took when passing through Salazar and testified the bullet proceeded through Salazar in a straight path.

Rivas relies on *State v. Corey*, 304 Kan. 721, 736, 374 P.3d 654 (2016). But the facts in *Corey* are distinguishable from the facts here. In *Corey*, the prosecutor stated the "'actual scientific evidence'" showed the defendant's DNA on the victim. Instead, the evidence at trial showed the chance of a random match with an unrelated male in the general population was 1 in 9. Obviously, the prosecutor's statement was erroneous—an overstatement. But we note the *Corey* court held that the error was not gross or flagrant or the product of ill will, and the prosecutor did not deliberately attempt to misstate the evidence. The court also found there was sufficient evidence to infer the DNA belonged to the defendant. The court did not overturn the conviction. 304 Kan. at 736-37.

The law allows a prosecutor to ask the jury to make reasonable inferences based upon the evidence. See *State v. Baker*, 281 Kan. 997, 1012, 135 P.3d 1098 (2006). Here, the prosecutor argued a reasonable inference from the forensic evidence. Stating "that's where the gun is. That's what the science tells you," may have been slightly overstating the forensic evidence in this case. While Rivas is correct that no expert testified about the location of the gun when it was fired, it is reasonable to infer the location of the gun based upon the way the bullet entered the wall and the final location of the bullet fragments. See *State v. Lowrance*, 298 Kan. 274, 286, 312 P.3d 328 (2013). In *Lowrance*, the prosecutor was allowed to make a reasonable inference that a substance was blood, although no testimony from an expert supported that specific conclusion. 298 Kan. at 286.

Here, the crime scene investigator testified that the bullet traveled at a downward angle through the wall. One bullet fragment was found in the pool of blood in Salazar's living room, and one fragment was found in the bedroom—the fragment lined up with the

hole in the kitchen wall. It is reasonable to infer the path the bullet took from the evidence that was presented. Additionally, the State's argument that there was no evidence of a deflection is supported by the medical examiner's testimony that the bullet took a straight path through Salazar's head.

We hold the prosecutor's statements here were not erroneous, because they were reasonable inferences from the evidence that was admitted at the trial. See *Lowrance*, 298 Kan. at 286; *Baker*, 281 Kan. at 1012. Ultimately, these statements are within the wide latitude afforded to prosecutors to obtain a conviction and are not erroneous. See *Sherman*, 305 Kan. at 109.

The second set of challenged statements involves comments on the witness' credibility based upon the forensic evidence, including the location of the gun. In relation to Rodriguez' testimony concerning the location of the unidentified shooter, the prosecutor stated, "How does this bullet come from a gun that's fired from over here (indicating)? . . . No[t] consistent with the physical evidence. Again, you're the judge of the credibility, maybe you will find it did, seems to defy common sense." The prosecutor went on to say, "She still can't get the basic idea of where the people are, according to the physical evidence, which is incapable of lying."

Turning to the State's argument on their witness' credibility, the prosecutor stated,

"They have forensics to compare to the witness's story. Science deals with that. The witnesses all give their statements. [The defense attorney] indicates they didn't see it, but they all give statements that are consistent with the forensic evidence that isn't even collected yet. [The crime scene investigator] didn't even get to the scene until after all of these witnesses gave their statement. How are they all going to put Manuel Rivas on the correct line where the bullet ends up going? It's the same downward angle that they demonstrated in the interview room if they weren't there? How do they get those details

13

right? The CSI didn't even know that. And the DNA corroborates that Manuel Rivas was there."

Basically, Rivas argues this statement misstates the evidence because he claims two of the witnesses' statements were inconsistent with the forensic evidence. The alleged inconsistencies involve the location of Salazar's gunshot wound. The medical examiner testified that the entrance wound was on the top left side of Salazar's head and the exit wound was on the lower right back of Salazar's head.

Rivas argues that in Mejia's interview with the police, the photograph of Mejia reenacting the shooting shows that Mejia's fingers, which represented the gun, are on the right temple area. Rivas claims this is *contradicted* by the medical examiner's forensic evidence, not *corroborated* by the forensic evidence; thus, the prosecutor misstated the evidence. Rivas also challenges that Sotello provided testimony contradicted by the forensic evidence when he testified that Salazar was shot in the back of the head.

The prosecutor's statements are not as broad as Rivas is alleging. The prosecutor is not stating that every statement by his witnesses is corroborated by every piece of forensic evidence. Rather, the prosecutor only stated that all three State witnesses placed Rivas on the line where the bullet ends up, and he was holding a gun at a downward angle.

This argument is supported by evidence within the record. Rivas concedes that Reyes' testimony supports this statement. Mejia's testimony placed Rivas in the kitchen when the shot was fired. The photograph reenacting the event shows Mejia's fingers pointed at a downward angle. Sotello testified that Rivas was in the kitchen but that he did not see the shot that was fired. Sotello's testimony is still consistent with placing Rivas in the path of where the bullet ended. Evidence that was admitted supports the prosecutor's statement; thus, the statements were not erroneous.

14

Because the statements by the prosecution were not erroneous, it is unnecessary to reach the prejudice prong of the prosecutorial error test. See *Sherman*, 305 Kan. at 109.

*The court acted within its discretion in denying Rivas' motion for a mistrial.*

Rivas argues that the district court erred in denying his motion for a mistrial based upon alleged juror misconduct—sleeping during the presentation of evidence. Rivas brought to the court's attention that he believed two jurors had been sleeping during the presentation of Rodriguez' video deposition testimony.

The judge told both parties that he saw Juror K close his eyes and at one point he began "dozing off more than he ought to." When this dozing occurred, the judge took a recess. This dozing off occurred during the State's case-in-chief, but Rivas contended that Juror K had been sleeping at a different point in the trial—the presentation of Rodriguez' video deposition. The judge questioned Juror K, and he stated that while his eyes were closed, he still listened to the testimony. Additionally, Juror K stated that he had heard all the evidence.

Rivas alleged a second juror, Juror C, had been sleeping during the trial as well. Juror C had admitted to the judge's administrative aide that she had fallen asleep during the trial. The district court ended up dismissing Juror C from the jury but determined a mistrial was not warranted because there was an alternate juror available.

A review of some fundamental points of law is useful at this point. The district court may order a mistrial when prejudicial conduct, in or outside the courtroom, makes it impossible to proceed with the trial without injustice to either the defendant or the prosecution. See K.S.A. 22-3423(1)(c). Rivas argues that the alleged sleeping of Juror K during Rodriguez' deposition testimony lowered the functional number of jury members below 12. In a felony trial, a jury must consist of at least 12 members unless there is an

15

agreement between both the prosecution and the defense, which is approved by the court, to continue with fewer jurors. K.S.A. 22-3403(2).

Rivas relies upon the holding in *State v. Miller*, 11 Kan. App. 2d 410, 411-13, 722 P.2d 1131 (1986), where a panel of this court reversed a conviction where the record conclusively showed that a juror had not heard at least part of the testimony. In *Miller*, a juror was having difficulties hearing testimony due to a hearing impairment. Instead of excusing the juror and granting a mistrial, the district court moved the juror to the front row of the jury box. The panel held that the district court should have dismissed the juror and declared a mistrial, unless the defendant waived the right to have a 12-person jury. Denying the defendant's motion for a mistrial was an abuse of discretion. 11 Kan. App. 2d at 413.

We find the facts in *Miller* distinguishable from the facts in this appeal. In *Miller*, it was clear from the record that the hearing-impaired juror had not heard part of the testimony. But here, Juror K stated that he had not missed any of the testimony. Unlike *Miller*, the record here does not show that Juror K had missed any testimony.

But we do not stop there. Rivas' allegation of sleeping during Rodriguez' deposition testimony is partially corroborated by the district court's observation that Juror K was starting to doze off at an early point in the trial. This corroboration, however, does not necessarily mean that Juror K had actually fallen asleep or missed any of Rodriguez' testimony. Without corroboration of Rivas' allegation that Juror K had missed Rodriguez' testimony, the court did not abuse its discretion by denying the motion for a mistrial. See, *e.g.*, *State v. Kimmel*, 202 Kan. 303, 305-06, 448 P.2d 19 (1968).

These facts seem similar to *State v. Kirby*, 272 Kan. 1170, 39 P.3d 1 (2002), and *State v. Armstrong*, 299 Kan. 405, 443, 324 P.3d 1052 (2014). In *Kirby*, the defense raised the issue of inattentiveness of two jurors to the court. The district court observed

16

that a juror was closing his eyes while listening to the evidence and at one point nodded off. The district court believed it took appropriate action and after that point it appeared that all jurors were paying attention. The Kansas Supreme Court found that there was no statement by the juror that he had not heard the testimony. Additionally, the district court was aware of the juror's tendency to close his eyes while listening to the testimony, took a recess when the court believed the juror was dozing off, and did not observe the juror sleeping at any other point following the recess. Due to these factors, the court determined there was no abuse of discretion in the denial of a motion for a new trial. 272 Kan. at 1197-98.

Similarly in *Armstrong*, the defendant's counsel informed the court that he thought he saw a juror falling asleep during trial. No evidence indicated that the juror had missed any testimony. The judge noted that he saw the juror "'struggling a bit, but I don't know that I ever saw her really nod off.'" The alleged sleeping occurred during preliminary testimony of an expert and not on the evidence pertinent to the case. Our Supreme Court held that this did not amount to a fundamental failure in the proceedings warranting a mistrial. 299 Kan. at 443.

If we take into consideration the holding in *Armstrong* and *Kirby*, a mistrial was not necessary here. The judge observed that Juror K closed his eyes while listening to testimony. When the judge believed Juror K was "dozing off more than he ought to," he called a recess.

After all, taking a recess when it appears that a juror is struggling to stay awake is a proper action for the district court to take. See *Kirby*, 272 Kan. at 1197-98. Juror K stated that he had heard all of the testimony. In *Armstrong*, the lack of evidence of a juror missing testimony was a reason that a mistrial was not warranted. 299 Kan. at 443. The judge here did not observe Juror K dozing off at any other points at trial—a fact that affected the outcome of *Kirby*. See 272 Kan. at 1197-98.

While the judge did admit he was not observing Juror K during Rodriguez' testimony, based upon his other observations throughout the trial, the judge concluded that the only time Juror K had difficulty staying awake was during the DNA testimony. This is a finding of fact that is unassailable on appeal. After all, we were not there—we did not watch the jury as the trial judge did.

We hold that Rivas' allegation that Juror K was sleeping is insufficient to warrant a mistrial. The district court did not abuse its discretion in denying the motion for a mistrial.

*We must vacate this sentence.*

Rivas' final arguments on appeal involve his sentence. Rivas challenged his criminal history score on his PSI report. It set his criminal history category as B due to one person felony conviction and three person misdemeanor convictions that were lumped into the equivalent of one person felony. In his motion challenging his criminal history, Rivas asserted that he had no recollection of the three misdemeanor convictions or having counsel for these convictions. The district court held an evidentiary hearing on the existence of the convictions and whether there was counsel present.

Rivas does not challenge his conviction in 07TR2467, a conviction for failure to stop at an injury accident—a class A person misdemeanor. At the sentencing hearing, the State presented an acknowledgment and waiver of rights upon a plea of guilty. This document shows that Rivas was informed of his right to counsel and waived that right.

In this appeal, Rivas does challenge the district court's determination on two cases—11DV3268 and 13DV1173.

18

To prove these convictions, the State introduced two documents for each case—the disposition sheet and a screenshot of the eJustice system notations on the case. A screenshot is a printout of what is seen on the computer screen.

We must pause at this point and address a sub-issue of who had the burden of proof for the conviction reflected in the records of 11DV3268. The State asserts that the burden shifted to Rivas because in a 2012 case Rivas did not object to his criminal history score that scored 11DV3268 in the same way as the current case. In opposition, Rivas contends that he is not estopped from challenging the existence of the conviction in 11DV3268, because there is no evidence of a determination of the merits of his claim from the 2012 case.

Precedent controls this. In *State v. Schow*, 287 Kan. 529, 197 P.3d 825 (2008), the Supreme Court determined a similar issue. The court held that the burden of proof remains with the State when a defendant files a written objection to his or her criminal history even though the convictions were contained in a prior criminal history worksheet. 287 Kan. at 539-40.

In *Schow*, the court overturned the sentences and remanded the case because the district court erred in shifting the burden to the defendant. 287 Kan. at 539-40. Here, it is not clear whether the district court shifted the burden to Rivas. Rather, the district court held that based upon the documents and testimony presented, the criminal history score in the PSI report was correct. If the court shifted the burden, it was erroneous. If it did not, we see no error. As we are vacating this sentence anyway, we need go no further on this point.

We turn now to the substantive arguments raised by the parties. Rivas makes a two-pronged attack on this point. First, Rivas contends that some of the evidence—specifically, the screenshots of the eJustice system—were erroneously admitted.

19

Following that, even if the evidence was properly admitted, the evidence was not sufficient to support the district court's legal conclusion. We examine his attack in that order.

Rivas challenges the district court's decision to admit two screenshots, which provided information about the proceedings in municipal court for the two challenged convictions. At the district court, the State argued the documents fell within the business records exception to hearsay.

When reviewing a challenge to the admission of hearsay evidence we review the actions of the district court for an abuse of discretion. *State v. Robinson*, 293 Kan. 1002, 1023, 270 P.3d 1183 (2012). The party asserting the abuse of discretion bears the burden of proving the court abused its discretion. *State v. Smith-Parker*, 301 Kan. 132, 161, 340 P.3d 485 (2014).

The business records exception provides that hearsay may be admitted if it is in the form of

> "[w]ritings offered as memoranda or records of acts, conditions, or events to prove the facts stated therein, if the judge finds that: (1) They were made in the regular course of a business at or about the time of the act, condition or event recorded; and (2) the sources of information from which made and the method and circumstances of their preparation were such as to indicate their trustworthiness." K.S.A. 2016 Supp. 60-460(m).

Foundation for a business record does not require the custodian of a business record to testify. Any person who is qualified by knowledge of the facts may prove foundational facts. *State v. Cremer*, 234 Kan. 594, 601, 676 P.2d 59 (1984). This is where Rivas starts his attack.

20

At the hearing, Jamie Matthews, a support supervisor for the City of Wichita Municipal Court, testified. Matthews maintained and supervised the criminal justice records for the city. Through Matthews, the State submitted a disposition sheet for case number 11DV3268, a Wichita municipal court conviction. The disposition sheet indicated that Rivas was represented by "CPD," which Matthews testified meant the city public defender. Matthews stated that if the attorney had withdrawn, that would have been indicated on the disposition sheet, and no indication of withdrawal was present.

Next, the State attempted to admit a screenshot of the eJustice system concerning this conviction. Rivas objected for lack of foundation. The State argued that the business record exception applied and the screenshot was admissible. The court admitted the screenshot, and the screenshot indicated "ATTY COOPER CPD, SHANNON," was present and that Rivas pled and was placed on probation.

For case number 13DV1173, a disposition sheet indicated that "CPD" originally represented Rivas for the case. A second attorney, R. Sickmann, is listed on the disposition sheet. Matthews testified that it was Ron Sickmann. No date is given for when Sickmann entered his appearance, but Matthews stated that the city public defender automatically withdraws when another attorney enters.

Additionally, an eJustice screenshot for this case was admitted over Rivas' identical objection for the previous case. The eJustice screenshot shows that "ATTY SICKMANN, RONALD," and Rivas were present. Unlike the screenshot in 11DV3268, this screenshot does not indicate that Rivas pled; rather, it only shows he was sentenced to probation.

On cross-examination, Matthews stated that she did not have an independent recollection of either case. Rivas also introduced testimony from Shannon Cooper, the purported attorney for case number 11DV3268. Cooper had no recollection of being an

attorney for Rivas on this case. However, Cooper could not say that she had not represented Rivas on the case. Ronald Sickmann had passed away prior to this sentencing hearing, so there was no testimony regarding his possible representation in 13DV1173.

To us, Rivas challenges whether Matthews provided proper foundation for the screenshots. Matthews' position involved supervising the criminal justice records for Wichita Municipal Court. Matthews supervised the docket clerks who enter information into the eJustice system. Based upon her supervisory role she is well qualified to provide the foundational facts. See *Cremer*, 234 Kan. at 601. Matthews testified that the docket clerks enter the information into the eJustice system at the time the events occur in the courtroom.

Quentin Pittman testified on Rivas' behalf. During 2011, Pittman worked at the law firm that the City of Wichita contracted with to provide public defender services. Pittman oversaw the attorneys that were working as public defenders. Pittman stated that a docket could range from 26 to 32 cases and the clerks may enter information into the computer system contemporaneously or up to an hour after the events occurred. Pittman also stated that the attorneys that were working would occasionally rotate between courtrooms. The attorneys did not provide an official appearance, so Pittman assumed that the clerk would enter information into the eJustice system based upon which attorney they believed was working in the courtroom that day. Pittman did not have direct knowledge of this occurring, and his testimony was based on what he had heard from his employees.

Rivas did not have a recollection of the cases. Rivas did not remember appearing in court, having Cooper represent him, or entering a plea in case number 11DV3268. Rivas remembered calling Sickmann concerning representation but did not remember being represented or advised by Sickmann.

To us, Rivas relies on Pittman's testimony that the clerks may not enter the information contemporaneously with the events occurring to show the writings were not made at or about the time of the event.

We must point out that it is unclear how this testimony from Pittman affects the admissibility of the evidence, because the screenshots had been admitted prior to Pittman testifying. His testimony may affect the probative value of the evidence as it seems to contradict Matthews' statement that the docket clerks enter the information contemporaneously with the events occurring. A question of the probative value of the evidence does not lessen the foundational fact to which Matthews testified—the clerks enter the information contemporaneously with the event occurring in the courtroom.

We hold that Rivas did not satisfy his burden of showing the district court erred in admitting the evidence based upon the first prong of the business records exception. We now turn to the question of the records' trustworthiness.

Rivas also challenges the trustworthiness prong of K.S.A. 2016 Supp. 60-460(m). He argues that inconsistencies within the screenshots themselves show that the documents were not trustworthy. The business records exception applies if the sources from which the information comes and the manner it is prepared indicate trustworthiness. K.S.A. 2016 Supp. 60-460(m). Here, the sources of the information were the docket clerks entering the information into the eJustice system. As employees of the court, they are sources that are trustworthy. The manner through which the information was prepared is a court setting which indicates the information is trustworthy. Similar to the argument concerning the time of preparation, Rivas' trustworthiness argument is actually centered on the probative value of the evidence and not its admissibility. Rivas has failed to show that the district court abused its discretion in admitting the screenshots under the business records exception.

23

Where Rivas' sentence fails is the lack of evidence to support the court's conclusion. We question whether substantial competent evidence supports the district court's determination that the State had met its burden of proving the validity of the convictions by a preponderance of the evidence. See *State v. Hughes*, 290 Kan. 159, 162, 224 P.3d 1149 (2010). Substantial competent evidence refers to legal and relevant evidence that a reasonable person could accept as being adequate to support a conclusion. *State v. Talkington*, 301 Kan. 453, 461, 345 P.3d 258 (2015). We first look at the instance where there was sufficient evidence.

In case number 11DV3268, the disposition sheet states that "CPD" was the attorney and entered on November 15, 2011. November 15, 2011, was Rivas' first appearance for this case. CPD stands for the Wichita City Public Defender. There is no date on the withdraw line. Matthews testified that if the attorney had withdrawn, this line would have a date with it. The disposition sheet shows Rivas pled no contest to the charges and that Rivas was convicted.

But the disposition sheet alone is insufficient to support a finding that Rivas was counseled. Rivas being counseled is important because the Supreme Court has found that an uncounseled misdemeanor conviction cannot be used to enhance a person's criminal history score if the punishment for the offense includes the possibility of jail or prison. See *State v. Youngblood*, 288 Kan. 659, 670, 206 P.3d 518 (2009). The *Youngblood* court stated, "The right to counsel arises at the stage of the proceedings where guilt is adjudicated, eligibility for imprisonment is established, and the prison sentence determined." 288 Kan. 659, Syl. ¶ 2. The disposition sheet here is insufficient because it does not indicate that counsel actually represented Rivas when he entered his plea. See *State v. Neal*, 292 Kan. 625, 640, 258 P.3d 365 (2011).

*Neal* involved a motion to correct an illegal sentence based upon uncounseled misdemeanors that was summarily denied by the district court. The Supreme Court held

24

that an entry on a disposition sheet that stated "P. Journey, CPD," was insufficient to show that a defendant was represented by counsel at the time of his conviction. 292 Kan. at 635-36. Although the journal entry indicated that counsel had entered at a specific date, the date listed was after the conviction had occurred. Because it was unclear that Neal had counsel at the time he was convicted, the Supreme Court remanded the case to the district court to hold an evidentiary hearing. 292 Kan. at 640. Here, the disposition sheet only shows that a city public defender had entered the case. It does not show that Rivas was actually represented by counsel when he pled no contest and was convicted. Thus, without information that Rivas was represented at the time of his conviction, there is insufficient evidence from the disposition sheet alone to use this conviction to enhance the sentence. See 292 Kan. at 636-40; *Youngblood*, 288 Kan. at 670.

We recognize that here, in contrast to *Neal*, the district court also had the eJustice screenshot. The screenshot states, "ATTY COOPER CPD, SHANNON Present" and "[d]efendant present in courtroom, def pled and placed on probation . . . ." The statement within this screenshot provides sufficient evidence to show by a preponderance of the evidence that Rivas was represented for this conviction. When the statement that Shannon Cooper was present and that Rivas pled is taken in conjunction with the disposition sheet, that corroborates the information—the district court had substantial competent evidence to find that Rivas was represented, fulfilling the *Youngblood* requirement.

The disposition sheet and eJustice screenshot can lead a reasonable person to conclude that Rivas was represented at the time of his conviction. Substantial competent evidence supports the district court's determination. But evidence on the remaining two convictions differs.

Turning to 13DV1173, the disposition sheet provides information similar to that of the disposition sheet in 11DV3268. First, the disposition sheet indicates that CPD was the

25

defense attorney for Rivas and that the CPD entered on May 16, 2013. Rivas' first appearance appears to have been on May 15, 2013, but the sheet also indicates that Rivas was "advised of charges, penalties, right to counsel and bond conditions on" May 16, 2013. The disposition sheet shows Rivas pled no contest and was convicted.

Unlike the disposition sheet in 11DV3268, here, there is a second attorney listed, "R. Sickman [*sic*]." Although Sickmann was listed, there is no date when he entered into representation of Rivas. Additionally, there is no date where the CPD withdrew from the case. Similar to the disposition sheet in 11DV3268, the information contained within this disposition sheet alone is insufficient to support a conclusion that Rivas was represented at the time of his conviction. See *Neal*, 292 Kan. at 640.

The problem arises with the screenshot. The eJustice screenshot for this case does not indicate that Rivas was represented at the time of his conviction. The screenshot states "Bench trial held," "ATTY SICKMANN, RONALD Present," and "[d]efendant present in courtroom. def placed on probation." The most that can be ascertained from this screenshot is that Sickmann was present for a sentencing hearing. In contrast to 11DV3268, the disposition sheet and screenshot for 13DV1173 do not provide evidence that Rivas was represented at the time of the conviction. Based upon the lack of evidence that Rivas was actually represented at the time of his conviction, there was not substantial competent evidence to support the conclusion that 13DV1173 could be used to increase Rivas' criminal history score. See *Neal*, 292 Kan. at 636; *Youngblood*, 288 Kan. at 670.

Also, the State's reliance on *State v. Hooks*, No. 107,582, 2013 WL 1876448 (Kan. App. 2013) (unpublished opinion), is not persuasive. The State argues that the documents presented in *Hooks* contained less information than the documents that were presented in this case. *Hooks*, however, involved a motion to correct an illegal sentence. In a motion to correct an illegal sentence, the burden shifts to the defendant. 2013 WL 1876448, at *4. The defendant in *Hooks* did not provide any evidence that the sentence was illegal,

26

but rather attempted to shift the burden of proof onto the State. 2013 WL 1876448, at *4-5. Ultimately, the panel made no determination that the State had met its burden through the documents which were provided to the district court. Thus, *Hooks* is not applicable to the present case.

The district court had substantial competent evidence to conclude that Rivas was represented in 11DV3268, but there was not substantial competent evidence to conclude there was representation in 13DV1173. Rivas was sentenced with a criminal history score of B. The State only proved that one person felony and two person misdemeanors were valid to be used in Rivas' criminal history score—this is insufficient to support a criminal history score of B. See K.S.A. 2013 Supp. 21-6809. Rivas' sentence must be vacated and the case remanded to resentence Rivas in the appropriate criminal history category.

We affirm Rivas' conviction, vacate his sentence, and remand for a new sentence.